SAI INDUSTRIES CORP., Plaintiff

v.

**The UNITED STATES, Defendant.**

**No. 03–2698C.**

United States Court of Federal Claims.

May 26, 2004.

Laurence Schor, Washington, D.C., attorney of record for plaintiff.

James D. Colt, Washington, D.C., with whom was Assistant Attorney General Peter D. Keisler, for defendant.

## *OPINION*

REGINALD W. GIBSON, Senior Judge.

## INTRODUCTION

This pre-award bid protest case was filed by SAI Industries Corp., a metalworking firm based in San Antonio, Texas. Here at bar, SAI seeks a permanent injunction to prevent the government from awarding solicitation SPO475–04–R–0397 for the production of T–37 aircraft tailpipes. SAI belatedly learned that it was not a pre-approved source for said T–37 tailpipes, on or about October 21, 2003, through the Defense Logistics Agency's ("DLA") Defense Supply Center— Richmond ("DSCR") facility. Previously, SAI had supplied DSCR with such tailpipes under three prior contracts, contract SPO475–98–M–3765 (awarded in March 1998), contract SPO475–00–M–NC96 (awarded in May 2000), and contract SPO475–01–C–1906 (awarded in August 2001), and during which time(s), it was on the DSCR's pre-approved source list. In subject complaint, SAI alleges herein that (i) DSCR's decision to remove it (SAI) as an approved source was arbitrary and capricious, and otherwise in violation of applicable law, (ii) DSCR's tardy notification of SAI of its removal is in violation of applicable law, (iii) DSCR violated

1. Pursuant to Appendix C, Sec. II of the Rules of the Court of Federal Claims, the plaintiff in this action filed a Pre–Filing Notice of Bid Protest on November 19, 2003.

2. Page 8 of the instant solicitation states that "[t]he foregoing delivery requirements are based on the assumption that the Government will make award by 02/17/04." This court requested

FAR § 9.205 because it failed to urge SAI to qualify, as required, for future contracts for T–37 tailpipes, and (iv) SAI suffered actionable prejudice directly attributable to one or more of the aforementioned allegations. For reasons to follow, we GRANT SAI's motion for permanent injunction because we find that SAI was in fact prejudiced by DSCR's failure to timely notify SAI of SAI's removal from the approved source list for the production of T–37 aircraft tailpipes in violation of FAR § 9.207(b), and also by DSCR's failure to comply with FAR § 9.205, which requires the government to make a bona fide effort to encourage competition when a solicitation is restricted to approved sources.

## PROCEDURAL POSTURE

This pre-award bid protest arises out of the Defense Supply Center Richmond (DSCR) solicitation SPO–475–04–R–0397 for the manufacture of T–37 military aircraft tailpipes. Plaintiff, SAI Industries Corp., filed this action with the court on November 20, 2003.[1] As the closing date for the instant solicitation was scheduled for November 20, 2003, and the award date noted in the solicitation was on or before February 17, 2004,[2] plaintiff requested neither a TRO nor a preliminary injunction. Instead, plaintiff seeks only permanent injunctive relief to prevent the government from awarding the instant solicitation without considering SAI for the award. At a status conference with the parties held on November 25, 2003, the court inquired of the government whether it would consider withholding the award of said contract until the court was able to rule on the propriety of plaintiff's motion for a permanent injunction. The government, heeding the court's advice regarding the difficult position it would be placed in if it awarded the contract and was subsequently enjoined by this court, agreed to stay the award of the instant solicitation until the court's ruling on this bid protest. On March 22 and 23, 2004,

a copy of the solicitation at the outset of this bid protest, and received a hardcopy of same on November 25, 2003. It is this copy that contains this information, as the Administrative Record, for some inexplicable reason, contains only the odd-numbered pages of the solicitation, although said pages are consecutively number AR 027–038.

oral argument was heard in open court on plaintiff's motion for permanent injunction, at which time additional evidence was received by the court to supplement the administrative record.[3]

## JURISDICTION

Pursuant to 28 U.S.C. § 1491, the United States Court of Federal Claims has jurisdiction to hear pre-award bid protest claims of interested parties,[4] and "may award any relief that the court [deems just and] proper, including [but not limited to] declaratory and injunctive relief." 28 U.S.C. § 1491(b)(2).

## FACTUAL BACKGROUND

### A. The Instant Solicitation

As previously noted, plaintiff, SAI, is a metalworking firm based in San Antonio, Texas. Since 1998, it had supplied T-37 tailpipes to the DLA. In fact, SAI supplied three of the previous four such contracts, specifically contract SPO475-98-M-3765 (awarded in March 1998), contract SPO475-00-M-NC96 (awarded in May 2000), and contract SPO475-01-C-1906 (awarded in August 2001). The parties agree that the T-37 tailpipe is a flight-safety critical part,[5] and that the government has maintained a list of qualified sources of supply ("pre-approved list") since at least 1990 to ensure the quality of the T-37 tailpipes it procures.

On or about October 3, 2003, the government posted a notice that it would issue solicitation SPO475-04-R-0397 for the production of T-37 aircraft tailpipes on October 17, 2003. This notice was posted on the internet on the Federal Business Opportunities website, and on the DLA Procurement Gateway. In view of the pre-solicitation posting on the internet, SAI learned of the forthcoming issuance of the subject solicitation on or about October 3, 2003. The pre-solicitation notice, and the subsequently issued solicitation, listed two vendors as approved sources,[6] to wit: Barnes Group Inc. and Senior Operations Inc. Barnes Group has not previously supplied T-37 tailpipes to DLA, but it completed a Source Approval Request (SAR) that was forwarded to Hill Air Force Base ("AFB"), to the attention of Jacob McCreakon (sic),[7] and was subsequently qualified as a pre-approved source on November 26, 2002. Mr. McReaken is a Mechanical Systems Engineer attached to Hill AFB in Ogden, Utah. He is part of the Engineering Support Activity ("ESA") for T-37 tailpipe procurements.[8] The vendor Senior Operations has, on the other hand, supplied a prior contract for T-37 tailpipes in 1999. All other vendors seeking to bid on this solicitation were required to complete a

**3.** The court received 11 exhibits into evidence to supplement the administrative record. This was done because plaintiff successfully averred and established that the administrative record was not complete with respect to several fact issues that it contended were highly relevant to the ultimate issues in this case. "Supplementation is appropriate when the record 'still has lacunae that should be filled based on the protestor's challenges.'" *Al Ghanim Combined Group Co. Gen. Trad. & Cont. W.L.L. v. United States*, 56 Fed.Cl. 502, 507 (2003) (quoting *CCL Serv. Corp. v. United States*, 48 Fed.Cl. 113, 118 (2000)). Here, plaintiff contends that: (i) the government failed to consider all relevant evidence in making its decision to remove SAI from its approved source list, and (ii) the government's decision to remove SAI from the approved source list was accomplished *prior* to the date the government contends per the administrative record. For these reasons, the court permitted supplementation of the administrative record. *Pikes Peak Family Housing, LLC v. United States*, 40 Fed.Cl. 673, 677 (1998).

**4.** An interested party is defined as an "actual or prospective bidder or offeror whose direct economic interest would be affected by the award of

the contract or by failure to award the contract." 31 U.S.C. § 3551(2). SAI is the incumbent supplier of T-37 tailpipes to DSCR, and submitted a bid for this solicitation. Thus, SAI clearly has standing as an interested party.

**5.** T-37 tailpipes are a component of the exhaust system of the T-37 aircraft. "Weld failures can cause separation of the tailpipe within itself or from the aircraft. This may cause a class A mishap if it happens while in flight." AR 0224.

**6.** The administrative record indicates that a third company, Compucraft Industries, Inc., also began the pre-approval process on August 26, 2003, but it appears that they have not yet completed the process.

**7.** The administrative record contains a number of differing spellings of Mr. McReaken's surname; the court shall hereinafter spell his name as M-c-R-e-a-k-e-n for the sake of simplicity.

**8.** The ESA is responsible for all engineering determinations made in connection with the procurement of T-37 tailpipes.

SAR package by the closing date of the solicitation (*i.e.*, November 20, 2003) in order to qualify as a source for the product specified, pursuant to FAR § 9.202(c).[9] The government, however, need not delay the award of a contract in order to provide a potential offeror with an opportunity to qualify. FAR § 9.202(e).

When SAI became aware of the instant solicitation on or about October 3, 2003, it noted that it was not listed as an approved source. Upon the issuance of the solicitation on October 17, 2003, SAI emailed the buyer noted thereon, Mr. Charles Hall, and asked him *why* SAI was not listed as an approved source. Mr. Hall's non-responsive reply via email informed SAI only that it was not pre-approved to bid on this solicitation. Mr. Hall failed to provide SAI with any reasons why it was removed from the pre-approved source list. Mr. Hall did, on the other hand, inform SAI that it could complete a SAR package and, if successful, could qualify for the contract. Upon further questioning by the petitioner as to why it was not pre-approved, Mr. Hall informed SAI only that the ESA determined that SAI was no longer an approved source for T–37 tailpipes, and that SAI should get in contact with the ESA for specific information regarding the reason(s) for its removal. SAI was further informed that, while it could submit a SAR, the solicitation's November 20, 2003 closing date would not be postponed in order to give SAI time to successfully qualify. Thereupon, SAI submitted its bid, but did not submit a SAR until December 5, 2003. Following thereon, SAI brought this pre-award bid protest action.

## B.  SAI's Prior Performance History

As noted above, the petitioner had previously been an approved source for solicitations for the production of T–37 tailpipes, and had supplied three of the last four DLA contracts for them, *supra.* There is no allegation by the government, in either the administrative record or in the transcript generated at the hearing on plaintiff's motion for permanent injunction, that SAI's performance on its first contract, awarded in 1998, was in any way substandard. In that connection, SAI's president, Natu Patel, stated at the hearing that it encountered no problems under its T–37 contract performed in 1998, nor had they encountered performance problems in completing various other government contracts.[10]

Beginning in 2000, the government issued changed specifications to be used in the production of T–37 tailpipes. These new specifications called for stainless steel # 347, as opposed to stainless steel # 321 (as was specified under prior contracts). In May 2000, SAI was awarded contract SPO475–00–M–NC96 ("# 96 contract"), and in August 2001, SAI was awarded contract SPO475–01–C–1906 ("# 1906 contract"). These contracts, unlike the T–37 tailpipe production contract that SAI was awarded in 1998, called for stainless steel # 347.

The # 96 contract was completed by SAI and the tailpipes produced according to said contract were accepted by the government. The government subsequently noted voids in some of the welds on the # 96 contract tailpipes, and conducted a metallurgical study at Hill AFB. The findings of said study were published on February 28, 2002, and concluded that manufacturing defects were to blame for the tailpipe failures. A second metallurgical study was conducted, and the report of said study was published on September 24, 2002. This report similarly concluded that manufacturing weld defects caused the tailpipe failures.

Concurrent with the investigation into the # 96 tailpipe failures, SAI was producing additional tailpipes under the # 1906 con-

---

9.  FAR § 9.202(c) states as follows:

If a potential offeror can demonstrate to the satisfaction of the contracting officer that the potential offeror (or its product) meets the standards established for qualification or can meet them before the date specified for award of the contract, a potential offeror may not be denied the opportunity to submit and have considered an offer for a contract. . . .

10.  Mr. Patel stated in his hearing testimony on March 22, 2004, that SAI had performed two prior contracts, not including contract # 1906. Tr. at 65. He also stated that, in addition to T–37 tailpipes, SAI has produced a number of other products for the government, and that there were no problems with prior government contracts until contract # 1906 (discussed in text, *infra* ). Tr. at 55–56, 59, 65. The procurement history for T–37 tailpipes found at Tab 2 of the administrative record supports Mr. Patel's testimony.

tract. In light of the problems noted under contract # 96, the government sent a quality assurance representative to SAI to perform a site inspection for quality control purposes. According to internal government communications, said quality assurance representative noted no problems during his site inspection of SAI. Subsequent to that site inspection, the government nonetheless noted defects in tailpipes supplied under the # 1906 contract. Citing quality concerns, the government issued a stop-work order to SAI regarding contract # 1906.[11] The government also issued a Corrective Action Request ("CAR") to SAI on April 23, 2002, referencing contract # 1906, and informing SAI that its equipment was not properly calibrated. The CAR stated that SAI had to have its equipment recalibrated before the government would accept any further SAI tailpipes. SAI had the recalibrations conducted, and the CAR restriction was lifted. Additionally, the government conducted two metallurgical studies on the tailpipes manufactured under contract # 1906. The results of the first such study were published on June 10, 2002, and concluded that welding defects caused the failure. The results of the second such study were published on March 19, 2003, and also concluded that welding defects caused the failures.

It is undisputed that the government and SAI worked together to overcome quality control issues. The government issued several contract modifications that added procedures to the quality control measures that SAI was required to follow under contract # 1906.[12] Nonetheless, at present, work under contract # 1906 remains frozen, and the most recent contract modification has not been executed.

## ISSUES PRESENTED

SAI argues that the government violated applicable law and/or regulations in each of three ways. They are as follows:

11. SAI introduced this stop-work order for contract # 1906 into evidence at the hearing. It is dated November 7, 2002. Said stop-work order remains in force to this day.

12. Both contract modifications MOD P00002 and P00003 were included in the administrative record. Both contract modifications changed the contract to add additional quality controls to SAI's quality inspection procedures. Additional-

1. The decision to remove SAI from the approved source list was arbitrary and capricious, and an abuse of discretion, at the time it was made.

2. When SAI was removed as an approved source, the government failed to directly and promptly notify SAI about the change in status in violation of FAR § 9.207(b).

3. The government improperly excluded SAI from the pre-approval process in violation of FAR § 9.205.

■ Any one of the above issues represents a significant deprivation in the procurement process. However, in order to succeed in this bid protest action, SAI must prove, by *clear and convincing* evidence, that at least one of the above violations actually occurred. *TRW Environmental Safety Systems, Inc. v. United States*, 18 Cl.Ct. 33, 43 (1989) (citing *DeMat Air, Inc. v. United States*, 2 Cl.Ct. 197, 202 (1983)). In addition, "[a] protestor must show not simply a significant error in the procurement process, but also that the error was prejudicial, if it is to prevail in a bid protest." *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1581 (Fed.Cir.1996) (citing *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed.Cir.1996)). The prejudice requirement is also subject to the clear and convincing standard of proof. *Id.*

## DISCUSSION

I. Was the Decision to Remove SAI as an Approved Source for the Production of T–37 Tailpipes Grounds for Relief, in That It Was Arbitrary and Capricious Or in Violation of Law?

### A. Contentions of the Parties

■ Plaintiff contends that the decision to remove SAI as an approved source was arbi-

ly, plaintiff introduced MOD P00006, which also cited quality control issues as its basis for issuance, and added additional quality control measures. MOD P00001 was included in the administrative record, but was not issued for quality control purposes. Contract MOD P00004 and P00005 were not included in the administrative record, nor did plaintiff introduce them. Thus, we shall not infer their contents.

trary and capricious, *or* otherwise in violation of applicable law. In support of this contention, SAI sets forth two arguments: (I) SAI's removal from the approved source list was improper because the evidence of the decision itself is "elusive," and (ii) notwithstanding, the government's conclusion that SAI's manufacturing caused the failures noted in tailpipes produced under prior contracts # 96 and # 1906 was without a rational basis, and thus an improper basis for removing SAI from the approved source list. SAI contends that both arguments provide an adequate basis for this court to enjoin the government from requiring SAI to requalify as an approved source prior to bidding on the instant solicitation.

The government contends that the agency's actions are reasonably discernable from the administrative record. The administrative record, according to the government, establishes that SAI was removed due to manufacturing defects noted in the tailpipes SAI produced in fulfilling contracts # 96 and # 1906. Further, the government argues that said record provides an adequate basis for the government's conclusions that manufacturing defects in fact caused the defects noted in tailpipes produced under contracts # 96 and # 1906.

For reasons discussed below, we affirm the agency's decision to remove SAI from the approved source list.

B. Analysis

1. SAI alleges that the evidence justifying the government's decision to remove SAI is lacking.

The evidence of the decision to remove SAI from the approved source list is, argues SAI, elusive and, therefore, improper. SAI contends that neither the actual decision maker, nor the actual date of the decision, can be discerned from the administrative record. Further, SAI argues that the reason for the decision is also lacking from the administrative record. Thus, SAI alleges

that the decision itself was arbitrary and capricious.

Our analysis of the evidence SAI presents on these issues is guided by the Supreme Court, which stated that the courts should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Motor Vehicle Mfrs. Assn. v. State Farm Mut.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (quoting *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*, 419 U.S. 281, 286, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974)). In this regard, we are mindful that SAI bears the burden of establishing, by *clear and convincing evidence*, that the agency's decision is *not* reasonably discernable. We hold that SAI has not done so.

i. The date of SAI's removal from the approved source list.

SAI cites no authority for its contention that the *exact* date on which an action was taken is necessary for the agency's path to be reasonably discerned. We are unconvinced of the veracity of SAI's proclamation in this regard. We determine that, so long as it is clear that a decision was made, as here,[13] the date upon which the decision was made is generally relevant only with respect to the substantive issue of whether the decision was proper. For instance, in the subject case, we are mindful that the exact date of SAI's removal is relevant to the issue of prompt notice (discussed *infra*). The precise date is also relevant to the evaluation of the propriety of the decision to remove SAI, insofar as we must evaluate the government's decision to remove SAI based upon the evidence it had at the time it made the decision. *See Greeley v. United States*, 50 F.3d 1009, 1010 (Fed.Cir.1995). Consequently, we shall search the record to ascertain the exact date of the removal for these purposes.

SAI introduced evidence at the hearing, through an exhibit to supplement the administrative record, that the ESA[14] asked the DLA "how [to] remove [SAI] from the approved source list" on January 29, 2003.

---

13. SAI does not contend that a decision was never reached; to the contrary, SAI alleges that its removal from the approved source list was effective *prior* to April 2003.

14. Through an email from ESA Mechanical Systems Engineer Jacob McReaken to Roger Crone at the DLA.

Pltf. Ex. 12. This same exhibit disclosed that the DLA thereupon, on January 30, 2003, removed SAI as a source from "our PID." [15] *Id.* Additionally, SAI directs the court to Tab 31 of the administrative record: a DLA Form 339, dated January 30, 2003. Said Form is entitled "Request for Engineering Support" and contains a request to remove SAI as an approved source; the form was completed by the ESA. The government points to a deficiency report contained in the administrative record that states "2003–04–01 AIS (*sic*) has been removed as source of supply." AR 0121. This document, according to the government, establishes the date upon which SAI was removed from the approved source list.

At the hearing, SAI had the opportunity to question both Mr. Charles Hall (the Buyer responsible for procuring T–37 tailpipes) and Mr. Willie Ray Robinson (the Contracting Officer). SAI's counsel never asked either witness when SAI was finally and formally removed from the approved source list, nor did SAI elicit from any witness what internal procedures are required to accomplish removal. SAI also failed to establish the relationship between the "PID" and the approved source list. Without presentment of credible evidence, this court cannot equate the January 30, 2003 removal from the "PID" as a final removal from the approved source list. Further, after careful searching of the administrative record, supplements thereto, and the transcript record of the hearing, we are constrained to hold that SAI has failed to establish by clear and convincing evidence that SAI was removed from the approved source list prior to April 1, 2003. As noted, the exact date of SAI's removal is relevant to other issues presented by this case. Accordingly, we so find that SAI was removed from the approved source list on April 1, 2003.

 ii.  The party responsible for removing SAI from the approved source list is unidentified.

SAI's contention here is that the decision maker who decided to remove SAI from the

approved source list is not identified. Again, SAI does not argue that the removal was not effected. Because we concur with SAI that it is necessary that the decision was made by someone with the authority to make such decision in order for the removal to be valid, we shall explore this issue.

SAI notes, "Mr. Robinson testified that ESA's Mr. McReaken made the decision." (Tr. 296). SAI claims that this statement is contradicted by Plaintiff's Exhibit 12, an email from Mr. McReaken asking the DLA how to remove SAI as a source. Additionally, SAI argues that Mr. Robinson's statement is uncorroborated by the administrative record.

Mr. Robinson testified at the hearing that, as a Contracting Officer, he has no engineering expertise, and thus, he relies upon the ESA's recommendations regarding engineering decisions. Further, Mr. Robinson testified that Mr. McReaken had both the authority to make the recommendation to remove SAI, and in fact did so. Searching the administrative record, we note that Mr. McReaken's name appears on DLA Form 339, Request for Engineering Support. Said form states, "Request that SAI Industries Corp Inc. Cage:63095 be removed from AF–761 as an approved source. Per e-mail from Jacob McKreaken (*sic*) (Hill AFB)." AR 0243.

SAI's only evidence that Mr. McReaken did *not* have the authority to make the recommendation to remove SAI is Mr. McReaken's email asking *how* to go about the same. This court does not find that Mr. McReaken's procedural question regarding how to take action is *clear and convincing* evidence that he lacked the authority to take action. Thus, lacking any other evidence that tends to establish either that Mr. McReaken (i) did not have the authority to make the removal recommendation, or (ii) did not in fact make the recommendation himself, we must reject

---

**15.** "PID" was defined, via an unsworn statement from Contracting Officer Willie Ray Robinson, as "Product Item Description." Tr. at 276. (This statement was made from the gallery, and is unattributed in the transcript; the court recalls that Mr. Robinson was the speaker). Beyond this specious statement, no definition of PID was given, nor was it connected by counsel to the approved source list.

SAI's argument that the decision maker was unidentified.

  iii. SAI alleges that the administrative record states no basis for SAI's removal.

 SAI contends, correctly, that the administrative record never establishes that SAI was removed due to quality issues arising from tailpipe defects. SAI avers that only by surmise and inference does the administrative record suggest the basis for the decision to disqualify SAI. This, according to SAI, is factually and legally insufficient. The government, on the other hand, reminds this court that we must "uphold a decision of less than ideal clarity if the agency's path may be reasonably discerned." *Motor Vehicle Mfrs. Assn. v. State Farm Mutual,* 463 U.S. at 42, 103 S.Ct. 2856 (quoting *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.,* 419 U.S. 281, 286, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974)). In light of this binding precedent, the question becomes whether the administrative record permits us to discern the agency's path lacking an unambiguous statement to the effect that SAI is removed as an approved source *because* of a history of tailpipe failures. For the reasons that follow, we find that the agency's path may be reasonably discerned. Hence, we shall not reverse the agency's decision for lack of a pointed articulated basis.

 The administrative record reflects that the government found defects in SAI-manufactured T–37 tailpipes, produced under contracts # 96 and # 1906.[16] These defects are noted in the administrative record extensively. AR Tabs 15–16, 18–23, 25, 35–36. The administrative record includes four separate metallurgical reports, all of which conclude that manufacturing defects caused the tailpipe failures. Further, significant additional documentary evidence reflects a pattern of tailpipe failures in the tailpipes supplied by SAI. In addition, the administrative record contains numerous communications regarding quality issues encountered with SAI's T–37 tailpipes. One such document-denoted as a "Discrepancy Report" in the table of contents to the administrative record-wherein SAI's removal from the approved source list is noted,[17] also includes significant descriptions of SAI tailpipe defects. The government contends that this document represents the finalization of its decision to remove SAI from the approved source list.[18] Thus, the government detailed significant quality issues with SAI's goods, and included a description of such issues in the document that purports to finalize SAI's removal from the approved source list. Consequently, as we have stated, we find that the government's basis for removal of SAI as an approved source may be reasonably discerned.

  2. SAI alleges that the government's conclusion was arbitrary and capricious regarding the cause of tailpipe failures under contracts # 96 and # 1906.

 With respect to this issue, SAI contends that the government's conclusions regarding the cause of the tailpipe failures were reached without properly considering relevant evidence, rendering them arbitrary and capricious. Here, SAI argues that the government's conclusion, that the defective tailpipes supplied by SAI under contracts # 96 and # 1906 were due to manufacturing defects, ignored relevant evidence. This evidence, according to SAI, establishes clearly and convincingly that the defects noted were due to design defects. Thus, SAI argues, failure to consider this evidence renders the

---

**16.** SAI has never challenged the existence of the defective tailpipes; instead, SAI merely challenges the cause of said defects.

**17.** In actuality, the document-one of several discrepancy reports-notes that vendor "AIS"(*sic*) has been removed from the approved source list. AR 0121. The balance of the administrative record establishes that no such vendor exists, and we conclude that this reflects a transposition error. This is especially so because the document at issue was apparently created to delineate defects found in SAI's tailpipes.

**18.** As discussed, *supra,* plaintiff introduced evidence that it claims establishes that SAI was removed from the approved source list some time in January 2003, and not in April 2003 as the government contends. SAI failed, however, to establish by clear and convincing evidence that this is so.

agency's decision to remove SAI for quality problems arbitrary and capricious.

An agency action is not arbitrary and capricious if "substantial evidence" supports it. *See Greeley v. United States,* 50 F.3d at 1010. Substantial evidence is defined by the Supreme Court as "evidence such as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison v. NLRB,* 305 U.S. 197, 228, 59 S.Ct. 206, 83 L.Ed. 126 (1938). In addition, the government's analysis must take into consideration all relevant evidence. *Motor Vehicle,* 463 U.S. at 43, 103 S.Ct. 2856. Moreover, in matters within the scope of agency expertise, and requiring specialized technical expertise, "a reviewing court must generally be at its most deferential." *Baltimore Gas & Elec. Co. v. NRDC,* 462 U.S. 87, 103, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983). We determine that decisions made by the government's engineers regarding design specifications and vendors' manufacturing quality in light of those specifications clearly fall within this scope. Thus, we shall balance the substantial evidence standard in light of the level of deference accorded to an agency's decisions within its area of expertise.

As stated, SAI denies that said failures are attributable to manufacturing defects. According to SAI, the defects noted in tailpipes supplied under contracts #1906 and #96 were caused solely by the government's *change* to the design specifications for T–37 tailpipes. Said change required SAI to substitute stainless steel #347 in place of prior-used stainless steel #321. Plaintiff contends further that the substitution of stainless steel #347 for stainless steel #321 is so clearly to blame for the defects that any conclusion by the government to the contrary was not only erroneous, but so erroneous as to render the government's faulty conclusions arbitrary and capricious.

The government, as noted in the previous subsection, contends that the contracting officer, Mr. Robinson, relied upon the recommendations of the ESA. Thus, the government contends that this court is limited to determining the reasonableness of the contracting officer's decision to its reliance on the ESA's counsel. In essence, the government argues that this court's review is limited to examining (i) the reasonableness of the contracting officer's decision to rely upon agency engineers' determinations regarding engineering matters, and (ii) that such reliance here was reasonable as a matter of law.

We agree with the government that the contracting officer's reliance on the recommendations of its engineers is reasonable. A contracting officer cannot be expected to independently review the technical data regarding matters of engineering and manufacturing quality. We diverge from the government's point of view though, in that we do not agree that we are limited to examining the reasonableness of the *contracting officer's decision* to rely on the engineers' determinations. Such a limitation would foreclose *any* examination of the substance of the agency's determinations, and thereby grant the agency an irrebuttable presumption in its favor respecting *all* engineering determinations that effect the procurement process.

Contrary to the government's urgings in this case, "the deference [we give to an agency determination of a technical matter] is not absolute." *Cubic Defense Sys. v. United States,* 45 Fed.Cl. 450, 458 (1999). Instead, as we noted, matters within the scope of agency expertise, and requiring specialized technical knowledge, "a reviewing court must generally be at its most deferential." *Baltimore Gas & Elec. Co.,* 462 U.S. at 103, 103 S.Ct. 2246. Thus, we shall not disturb the government agency's determinations if SAI "point[s] out mere 'mistakes' or 'missteps;' they must 'show that the claimed misstep was so excessive as to fall outside the decision-maker's ambit of discretion.'" *Antarctic Support Assocs. v. United States,* 46 Fed. Cl. 145, 155 (2000) (quoting *Cubic Defense Sys.,* 45 Fed.Cl. at 458). Consequently, we shall "intervene only [if we] clearly determine[d] that the agency's determinations were irrational or unreasonable." *Baird Corp. v. United States,* 1 Cl.Ct. 662, 664 (1983).

    i.   The evidence that SAI argues (i) the government failed to consider and (ii) is relevant to tailpipe failures under prior contracts #96 and #1906.

In the instant case, plaintiff established that it encountered no quality problems un-

der its first contract for T–37 tailpipes, completed in accordance with the prior specifications that required stainless steel #321.[19] Plaintiff proffers this fact in an effort to establish that it is not SAI's workmanship that caused the defects noted in the tailpipes produced under the #96 and #1906 contracts. This contention does not bear out in light of the evidence, however. This is so because SAI has only performed (or, in the case of contract #1906, begun performance) on three T–37 tailpipe contracts, and two of the three contracts produced defective tailpipes. Only SAI's performance under its first contract was completed without quality problems. It is true that the satisfactorily performed contract was also the only contract that required stainless steel #321, but a single contract does not establish a pattern. Thus, plaintiff's lone prior successful T–37 tailpipe manufacture fails to support the inference that it is the specifications, and not SAI's workmanship, that led to the difficulties encountered with the tailpipes produced by SAI according to the current specifications.

SAI's T–37 procurement history was not the only evidence offered to establish that the ESA's conclusion, that SAI's quality of workmanship caused the tailpipes to fail, was arbitrary and capricious; SAI also called an expert witness, Leonard Hampson. Mr. Hampson was qualified as an expert in metallurgical engineering. He testified that the voids in the welds may have been caused by sensitization, an effect that occurs when a metal has been subjected to temperatures in excess of its tolerances. Mr. Hampson opined that when stainless steel #347 is exposed to temperatures between 1100 and 1500 degrees Fahrenheit, sensitization may occur. Mr. Hampson further testified that T–37 tailpipes experience a temperature of up to 1200 degrees Fahrenheit, a fact supported by the government's metallurgical reports. Thus, Mr. Hampson concluded that the voids noted in the T–37 tailpipes produced by SAI, using stainless steel #347, *may* have developed defects because of sensitization and not *only* due to manufacturing defects by SAI. Tr. at 243–245 (*e.g.,* "It's my opinion that there is more involved in this *than just the weld defects.*" (emphasis added)). As the government's metallurgical reports did not discuss sensitization as a possible cause, Mr. Hampson opined that the government had not "gone far enough in determining" the cause(s) of the defective tailpipes. Tr. at 244.

Mr. Hampson also testified that stainless steel #321 and stainless steel #347 are in the same family, and steels in the same family have the same susceptibility to sensitization. When asked by petitioner's counsel "[i]s the temperature range for susceptibility to sensitization for 321 different than 347?," Mr. Hampson stated that in his opinion "it's in the same temperature range." Tr. at 266.

Mr. Hampson was also asked about the use of Gas–Tungsten Arc Welds ("GTAW"). The government metallurgical reports indicated that such welds had been used in a effort to repair the tailpipes, and that such repair efforts may have led to some of the voids in the welds. Mr. Patel had testified that SAI did not make the GTAW welds that the government noted in its report. Mr. Hampson was asked if "Mr. Patel's testimony about whether he repaired welds using GTAW welding, create in your opinion a further reason to question the soundness of attributing the defects to Mr. Patel's manufacture of the pipes." Tr. at 272. In response, Mr. Hampson stated that he did not know who made the welds, or when they had been made. No other testimony or documentation regarding the possible source of the GTAW welds, and their possible contribution to the tailpipe failures, was offered by the plaintiff.

Regarding Mr. Hampson's testimony and the inferences we draw therefrom, first, it is clear to the court that plaintiff's expert could

---

**19.** As stated in note 7, *supra,* plaintiff's counsel argued that plaintiff had performed seven of the nine previous contracts, and that five of those seven contracts used stainless steel #321 and *all* of them were completed without *any* defects being noted. Thus, plaintiff's counsel argued, SAI had a long history of quality workmanship in relation to T–37 tailpipes that was interrupted only after the government changed the specifications to require stainless steel #347. This is patently untrue; SAI completed only a single contract for T–37 tailpipes (contract SPO475–98–M–3765, entered into in 1998) wherein the goods were found to be without defects.

not state that the government's metallurgical reports were unreasonable in light of the evidence. Second, we cannot conclude that the government's silence on the issue of sensitization warrants the inference that the government failed to consider sensitization. We think it is wholly possible that the government considered sensitivity as a factor, but rejected it as the ultimate cause. Third, we conclude that, on this record, the use of stainless steel # 347 as opposed to stainless steel # 321 was not established as a cause of the tailpipe failures. Fourth, this court is without sufficient evidentiary basis to determine either the source of the GTAW welds, or their effect in relation to the tailpipe failures. Further, if the plaintiff established that the government, and not SAI or its subcontractors,[20] made the GTAW welds to repair the tailpipes, that fact in no way undermines the government's conclusion that the tailpipes were defective.

Taking all of SAI's proffered evidence together, we find that SAI has failed to establish, by clear and convincing evidence, that, even had the government considered all the evidence SAI now sets forth, the government would not have reached any other conclusion regarding the cause of the tailpipe failures. Further, we are not clearly convinced that SAI has even established that the government failed to consider the evidence SAI now supposes. Lastly, we are equally unconvinced as to the persuasiveness of said evidence, as the bulk of SAI's evidence came through Mr. Hampson, who was unable to reach his conclusions with any level of certainty. Consequently, for all of the foregoing reasons, we affirm the defendant's decision removing SAI from the approved source list for T–37 tailpipe production as not being arbitrary and capricious or otherwise in violation of law.

## II. SAI's Failure to Receive Prompt Notice of its Removal as an Approved Source, in Violation of FAR § 9.207(b), as Grounds for Relief.

■ When the government removes a contract source from an approved list, applicable regulations require that–

[t]he agency shall . . . *promptly* notify the affected parties if a product or source is removed from a QPL, QML, or QBL, or will no longer be identified as meeting the standards specified for qualification. This notice shall contain *specific information why* the product or source no longer meets the qualification requirement.

FAR § 9–207(b) (emphasis added).

Before we can determine whether or not SAI received "prompt" notice of its removal as an approved source of supply, we must first make a finding regarding the date upon which removal was effective. As we discussed in subsection I.B.1.i., we held that SAI was formally and finally removed as an approved source on April 1, 2003.

Next, given that date, we must determine whether SAI received notice of its removal "promptly," from said date, as required by FAR § 9–207(b). Further, and equally significant, we must determine whether such notice included "specific information why" SAI's tailpipes were no longer acceptable on a pre-approved basis. FAR § 9–207(b). SAI contends that it never received any such notice, and that it only learned of its changed status from Charles Hall, the designated buyer for the subject solicitation, on October 21, 2003. Additionally, SAI points to the emailed communications between Mr. Hall and Mr. Patel, dated October 21 and 22, 2003, to establish that when Mr. Hall informed SAI that it was no longer an approved source for T–37 tailpipes, he was unable to provide specific information *why* SAI was no longer qualified. Instead, Mr. Patel was merely informed that "[t]o find out why [the responsible engineers] excluded your company as an approved source you will have to talk to them." AR 0232.

In contrast, the government contends that SAI knew that it was no longer an approved source as early as November 2002. The government premises this argument on the stop-work order, dated November 7, 2002.

---

**20.** Mr. Patel testified that SAI purchases the tailpipe cone assemblies from a subcontractor, and that SAI, not the government, is responsible for ensuring the quality of the parts it incorporates into the final product.

Pltf Ex. 2.[21] The stop-work order, which has yet to be lifted, established (according to the government) that the government would no longer accept SAI's T–37 tailpipes. Thus, the government urges this court to infer that SAI knew that it was no longer an approved source, and thus had constructive knowledge of its removal.[22] Additionally, the government argues that, delayed notice notwithstanding, SAI has now had a reasonable opportunity to requalify during the course of these proceedings, and should not now be given additional time to requalify. In support of the latter, the government cites FAR § 9.202(e), which states, "[t]he contracting officer need not delay a proposed award in order to provide a potential offeror with an opportunity to [qualify]."

We totally reject the government's contention regarding constructive notice of SAI's removal from the approved source list for the following reasons: First, the government cannot argue that the removal was not effective until April 1, 2003, out of one side of its mouth, and then argue that SAI should have known about its removal *some six months prior* to April 1, 2003, out of the other side of its mouth. The government has picked its path, and cannot now argue that SAI had "constructive knowledge" almost six months before the events occurred that could give rise to "actual knowledge." Second, we do not agree with the government's contention that constructive notice is all that FAR § 9.207(b) requires.

The plain meaning of FAR § 9.207(b) clearly indicates that a vendor whose pre-approval status is revoked is entitled to be "promptly notif[ied]" with respect to "specific information [as to] why the product or source

no longer meets the qualification requirement."[23] FAR § 9.207(b). Standing alone, this language seems to indicate that actual notice, at the very least, is required-if not actual, written notice. It seems unlikely that Congress would have added the requirement that the government must provide "specific information" if they deemed it acceptable and sufficient for a supplier to infer notice based on the surrounding circumstances. FAR § 9.207(b) does not appear to stand alone on this issue. Plaintiff directs this court to Appendix 2 of DoD 4120–24–M, *Defense Standardization Program (DSP) Policies and Procedures.* Therein, it sets forth the process for the government to follow when it removes a "product, family of products, or process(es) . . . from a listing." *DSP Policies and Procedures*, AP2.8.2.2. Said process requires written notice of the removal (by registered mail, with return receipt requested), setting forth the reasons for the removal, and an opportunity to respond. *Id.*

We do not decide today whether the policy set forth by DoD, above, has the force and effect of law, because we need not. Instead, we simply read said policy as an internal instructive policy tool to help guide our determination of the requirements set forth in FAR § 9.207(b). In so doing, we are constrained to conclude that the underlying policy behind both provisions is to ensure that a supplier is provided with prompt, specific, written notice of its removal in the event that the government removes it from a list of sources. This stringent standard exists because Congress wishes to encourage maximum competition for government contracts, and such notice will sufficiently enable the de-listed supplier to correct the perceived

---

**21.** It is unclear why defendant failed to include this order in the administrative record, especially as it now bases its argument that SAI had notice of a change to its pre-approved status based on said order. Clearly, defendant's own argument places this order at issue in this case, and as such, we properly allowed SAI to supplement the administrative record accordingly.

**22.** The government also contends that SAI and the government continued to work together to improve quality, so that SAI had an ample opportunity to correct any quality deficiencies. We disagree. While we acknowledge that the parties cooperated with each other and attempted to set

mutually agreeable quality control measures, it does not appear from the record that SAI has had an opportunity to have its work re-evaluated since the stop-work order went in force on November 7, 2002. Without government input regarding SAI's observable progress, SAI cannot be expected to know precisely how its products are deficient at present.

**23.** Neither party directed the court to a case that purports to interpret this provision. Moreover, the court's own extensive inquiry failed to uncover any precedent. Interpretation of this provision appears to be a matter of first impression.

deficiencies and again compete for contracts. We hold, therefore, that this goal would be severely undermined if the government were permitted to presume the knowledge of its supplier. Accordingly, on this record, we find that neither constructive, nor oral, notice fulfills the stringent requirements of FAR § 9.207(b), because such notice fails to provide de-listed suppliers with sufficient information to enable their timely requalification.

The government's second argument, namely, that SAI has now had an ample opportunity to requalify, is similarly unavailing. This is so because, as discussed above, SAI never received a formal notice of removal that provided "specific information why the product or source no longer meets the qualification requirement." FAR § 9.207(b). Consequently, SAI has yet to receive the benefit of the government's full explanation regarding its reasons for removal. Thus, any attempt that SAI has made in an effort to timely requalify in the interim was handicapped by the government's egregious violation of FAR § 9.207(b).

■ As we hold that SAI was removed as an approved source on April 1, 2003, and received no notice of its removal until more than six (6) months later,[24] we accordingly find, by clear and convincing evidence, that the government violated FAR § 9.207(b) with respect to failing to provide SAI with "prompt[ ]" notice of its removal from the approved source list, and the reasons for (i.e., "why") said removal.

III. SAI's Exclusion from the Pre–Approval Process Without "Sufficient Time to Arrange for Qualification Before Award" as Grounds for Relief.

In addition to the foregoing, SAI further contends that the government excluded SAI from the pre-approval process in violation of FAR § 9.205. This provision states:

Opportunity for qualification before award. (a) If an agency determines that a qualification requirement is necessary, the agency activity responsible for establishing the requirement must urge manufacturers and other potential sources to demonstrate their ability to meet the standards specified for qualification and, when possible, give sufficient time to arrange for qualification before award.

FAR § 9.205. SAI contends that the government's failure to "promptly" notify SAI that it was no longer an approved source for T–37 tailpipes and its manifest misleading of SAI over the nine months after removing SAI from its lists of approved sources irrefutably establishes that the Air Force acted directly contrary to FAR § 9.205.

■ ■ We interpret FAR § 9.205 as requiring the government to make a meaningful and bona fide effort to urge potential offerors to pre-qualify before award. How much effort is precisely required we cannot say. We will state, however, that when an incumbent offeror, as here, loses its pre-qualification status, and said offeror is never informed of such change, in violation of FAR § 9.207(b), the government violates FAR § 9.205. We find this to be so because (I) an incumbent offeror is a readily identifiable "potential offeror" that the government should "urge" to qualify, (ii) an incumbent offeror unaware that it is no longer pre-qualified to bid on future contracts is *least likely* to seek re-qualification without government urging, and (iii) an incumbent offeror may be more likely than a non-incumbent offeror to attempt to re-qualify upon learning that it is no longer qualified. Under facts such as those presented here, it appears that where a violation of FAR § 9.207(b) occurs and is never remedied, the government is also likely to have violated FAR § 9.205.

As noted in the previous subsection, the government argues that SAI has now had a reasonable opportunity to requalify, and thus should not be granted additional time by this court in order to permit said requalification. In support of this argument, defendant cites SAI's December 5, 2003 submission of a

---

**24.** We feel that the regulation's requirement of "prompt" notice should be interpreted to include all attempts at notification made within a reasonable time of the removal. In this case and on this record, we need not ascribe a specific time-frame to the word "reasonable;" instead, it is sufficient to conclude that more than six months is an *unreasonable* period of time in which to provide "prompt" notice.

Source Approval Request (SAR) packet to the agency.[25] Thus, the government contends that permitting SAI to attempt requalification again is inconsistent with FAR § 9.202(e). Said provision states that "[t]he contracting officer need not delay a proposed award in order to provide a potential offeror with an opportunity to [qualify]." FAR § 9.202(e).

We cannot accept this argument. While FAR § 9.202(e) does not require a contracting officer to delay an award to allow a potential offeror time to qualify, the government should not be allowed to take advantage of this self-serving regulation when its actions (or, as here, inactions) in violation of other FAR provisions directly led to the shortage of qualification time prior to the scheduled award date. To allow the government to invoke FAR § 9.202(e) as a shield in circumstances when the government's own violations of FAR led to the delay in a source's qualification goes squarely against basic principles of fundamental fairness. In effect, it would enable defendant to benefit from its own wrong. It is well established that he who seeks equity must do equity.

■ On this record, therefore, we hold that the government violated FAR § 9.205's requirement by failing to urge potential offeror SAI to demonstrate its ability to meet qualification requirements.

## IV. Prejudice

■ As noted above, in order to prevail in this action, it is not enough for SAI to simply establish that the government committed a procurement violation, *i.e.,* a violation of law and/or regulation. *See, e.g., Antarctic Support Associates v. United States,* 46 Fed.Cl. at 155. SAI must additionally prove that it was prejudiced by the error. *Id.* To demonstrate requisite prejudice, "the protestor must show 'that there was a substantial chance it would have received the contract but for the error.'" *Alfa Laval Separation, Inc. v. United States,* 175 F.3d 1365, 1367

(Fed.Cir.1999) (quoting *Statistica,* 102 F.3d at 1582).

■ SAI argues that it was prejudiced here either (I) by the government's allegedly improper decision to remove SAI as an approved source, or (ii) because SAI did not know it needed to re-qualify as an approved source prior to the issuance of the solicitation in October of 2003 due to the government's improper conduct. SAI further argues that, *but for* the government's improper conduct with respect to the foregoing, SAI was substantially likely to be the successful bidder for the instant solicitation.

For the reasons presented in Part I, *supra,* we conclude that the decision to remove SAI as an approved source was not improper. Thus, we now address whether or not SAI suffered prejudice based on our findings that the government violated FAR § 9.207(b) and/or FAR § 9.205.

Both violations share a core issue, namely—How much of an opportunity to re-qualify was SAI blatantly denied? More importantly—What was SAI deprived of when the government (I) failed to properly and promptly notify SAI of its removal as an approved source, and (ii) failed to urge SAI to requalify at any point after its removal? A single method of measurement may be applied to calculate either deprivation: the amount of time that elapsed between when the first violation occurred (April 1, 2003),[26] and the closing date of the solicitation (November 20, 2003). This calculation reveals that SAI lost out on more than 7½ months, due to the government's violations. Thus, had the government complied with FAR § 9.207(b) and promptly notified SAI of its removal as an approved source, SAI would have had up to 7–1/2 months to prepare a submission and attempt re-qualification. Likewise, had the government complied with FAR § 9.205 by urging SAI to re-qualify as an approved source upon SAI's removal from the approved source list, SAI would have had the same 7–1/2 month period to effect re-qualification.

---

25. The December 5, 2003 SAR packet was "informally rejected" by the government on March 19, 2004. Pltf. Ex. 9.

26. This represents the date on which SAI was removed from the pre-approved source list.

Thus, the question regarding the requisite prejudice becomes this: If SAI had the 7–1/2 months that it *should* have had to effect requalification, *and* SAI had also been given specific information as to the reasons why it was removed,[27] is it substantially likely that SAI would have requalified as a pre-approved supplier of T–37 tailpipes? And, if so requalified, would SAI have been substantially likely to be awarded the contract?

First, we believe that SAI had a substantial likelihood of being reinstated as an approved source had it been armed with details regarding its specific deficiencies and "why," and 7–1/2 months in which to complete the pre-approval process would have worked to its benefit in that regard. This is so because (i) SAI has previously met the government's quality standards and (ii) based on the length of time it took for the government to evaluate SAI's December 5, 2003 [28] SAR submittal, SAI would likely have been able to prepare and receive evaluations of two SAR submittals within the 7–1/2 month period. Hence, even if its first submittal was rejected, SAI would have had time to learn from that experience and re-attempt qualification. Thus, we find that, but for the government's violations of FAR § 9.207(b) and § 9.205, SAI was substantially likely to have been reinstated as an approved source for T–37 tailpipes.

Second, as we have noted, SAI is the incumbent contractor for T–37 tailpipes. SAI does not contend that an incumbent contractor is "more likely" to receive a contract award than a challenging contractor. However, it appears here that all quality matters regarding T–37 tailpipes are addressed via the pre-approval process. Thus, it seems logical to assume that T–37 bids from qualified sources are evaluated for price only. As the incumbent contractor who was awarded three (3) of the last four (4) contracts for said tailpipes, it is again logical to infer that SAI submitted the low-cost proposal to the government for each of the T–37 contracts it was awarded. Relying on these deductions, we consequently find that, barring any quality concerns and assuming that SAI is able to requalify as a pre-approved source, discussed *supra*, SAI has established by clear and convincing evidence that there was "a substantial chance it would have received the contract but for the error.'" *Alfa Laval*, 175 F.3d at 1367 (quoting *Statistica*, 102 F.3d at 1582).

## V. The Propriety of Injunctive Relief Entitlement.

■■■ In order to establish that it is entitled to permanent injunctive relief, the plaintiff must make three specific showings, by clear and convincing evidence, to wit: (i) that it will suffer specific irreparable injury absent the relief, (ii) that injunctive relief serves the public interest, and (iii) that the balance of the hardships favors plaintiff. *TRW Environmental Safety Sys., Inc. v. United States*, 18 Cl.Ct. 33, 72 (1989). Because a permanent injunction is an extraordinary remedy, we stringently review each element. *Id.*

27. As noted, *supra*, the record reflects that SAI has yet to be given specific information regarding the deficiencies that led to SAI's removal from the approved source list, as required by FAR § 9.207(b). Additionally, SAI submitted a SAR packet on December 5, 2003, but this packet was prepared without the benefit of said "specific information." Subsequently, on March 19, 2004, SAI received an "informal notification" of its failure to requalify. Pltf Ex. 9. Said notice failed to provide any specifics regarding the deficiencies that led to its rejection.

28. During the hearing on SAI's motion for permanent injunction in this matter, SAI sought to introduce an informal notification of its failure to requalify as an approved source, dated March 19, 2004. We allowed this notification to be admitted, as Pltf Ex. 9. Plaintiff represents to the court that it will, upon issuance of a formal

notice of its disapproval as a source that delineates the reasons for said disapproval, take the opportunity to cure any deficiencies in its submittal package and will re-apply for approved status. The government argues that, since SAI has now had an opportunity to requalify and SAI failed to do so, SAI is entitled to no further consideration. It is our opinion, however, that SAI completed its submittal without having all of the necessary and helpful information to which it was statutorily entitled under FAR § 9.207(b). Thus, SAI was handicapped when it prepared its submittal due to the government's violation of the regulations. Properly armed with a detailed, specific writing memorializing the deficiencies that prevented SAI's most recent submittal from being approved, we hold that SAI is substantially likely to meet with the opposite outcome.

A. Specific, Irreparable Injury

██ Irreparable injury can be shown in the "form of lost opportunity to fairly compete for and perform work under the contract, including but not limited to lost profits that would generate therefrom." *Metcalf Constr. Co., Inc. v. United States,* 53 Fed.Cl. 617, 645 (2002) (citations omitted). Here, it is clear that SAI was excluded from the competition process, clearly in violation of applicable regulations, perhaps only because of the defendant's improper conduct. Thus, SAI has established this element for injunctive relief by the requisite proof.

B. Public Interest

The public's interest is clearly served when suppliers engage in fair and robust competition for government contracts. Healthy competition ensures that the costs to the taxpayer will be minimized. Additionally, granting this injunction will ensure that this procurement is conducted according to all applicable procurement laws and regulations. *Metcalf,* 53 Fed.Cl. at 645. In turn, by upholding the integrity of the procurement process, "public confidence and competition in the federal procurement process will be preserved." *Id.* (citations omitted).

C. Balance of Hardships

Upon grant of this injunction, this procurement will be delayed until the terms of the injunction are satisfied. Moreover, the hope is that increased competition will result, providing a cost savings to the government. Finally, because this is a pre-award bid protest, there are no third-party intervenors whose interest may be adversely affected by an additional delay in this procurement. Thus, it is patently clear that the balance of hardships favors plaintiff SAI.

CONCLUSION

Based upon all of the foregoing, the court hereby–

(i) DENIES defendant's motion for judgment on the administrative record; and

(ii) GRANTS plaintiff's motion for permanent injunction and declaratory relief as follows:

(a) The court hereby declares that Solicitation SPO475–04–R–0397 is null and void and is hereby cancelled, enjoined, and set aside;

(b) The defendant, including but not limited to the Defense Logistics Agency, Defense Supply Center–Richmond, its officers, agents, servants, employees, and representatives and all persons acting in concert and participating with them respecting subject procurement be and they are hereby PERMANENTLY RESTRAINED AND ENJOINED from proceeding with the opening of bids and awarding of a contract under the foregoing solicitation which was unfairly and unlawfully administered; and

(c) The defendant and all said persons in concert are permanently enjoined under Solicitation SPO475–04–R–0397 until such time as–

(1) defendant provides plaintiff with a formal written notice specifically advising as to the reason(s) why defendant removed plaintiff from the pre-approved source list;

(2) defendant provides plaintiff with a formal written notice as to why defendant rejected plaintiff's SAR submittal dated December 5, 2003;

(3) plaintiff is afforded a reasonable time to submit a second SAR packet;

(4) the second SAR packet has been fully and fairly reviewed in view of existing specification and quality standards; and

(5) each qualified contractor has a reasonable opportunity to resubmit its bid following defendant's total compliance with all applicable laws and regulations.

The Clerk shall enter judgment accordingly. Costs to the plaintiff.

IT IS SO ORDERED.