1 F.3d 1201
 39 Cont.Cas.Fed. (CCH) 76,547
 AT & T COMMUNICATIONS, INC.,
and
Richard G. Austin, Administrator General Services
Administration, Appellants,
v.
WILTEL, INC.,
and
MCI Telecommunications Corporation, Intervenors.
 92-1474, 93-1090.
 United States Court of Appeals,
Federal Circuit.
 July 30, 1993.
Rehearing Denied; Suggestions for Rehearing In Banc
Declined Oct. 5, 1993.
 
 C. Stanley Dees, McKenna & Cuneo, Washington, DC, argued, for appellants, AT & T Communications, Inc. With him on the brief was Thomas C. Papson. Of counsel was G. Ridgley Loux. Kirk T. Manhardt, Attorney, Commercial Litigation Branch, Dept. of Justice, of Washington, DC, argued for appellants, Richard G. Austin, Adm'r Gen. Services Admin. With him on the brief were Stuart M. Gerson, Asst. Atty. Gen. and David M. Cohen, Director. Also on the brief was Seth Binstock, General Services Admin.
 David W. Burgett, Hogan & Hartson, Washington, DC, argued, for WilTel, Inc. With him on the brief was Jonathan S. Franlin. Also on the brief was Patricia E. Martin, WilTel, Inc., Tulsa, OK.
 Robert H. Koehler, Patton, Boggs & Blow, Washington, DC, argued, for intervenors, MCI Telecommunications Corp. With him on the brief were Mary E. Bosco and Michael J. Schaengold. Also on the brief was Robin L. Redfield, Corporate Counsel, MCI Telecommunications Corp., Washington, DC. Of counsel was Douglas R. Duberstein, Hogan & Hartson.
 Before NEWMAN, CLEVENGER, and RADER, Circuit Judges.
 RADER, Circuit Judge.
 
 
 1
 The General Services Administration Board of Contract Appeals (Board) granted Wiltel, Inc.'s and MCI Telecommunications Corporation's bid protest. Wiltel, Inc. v. General Services Admin., 1992 BPD p 201 1992 WL 189631 (GSBCA 1992). AT & T Communications, Inc. and the General Services Administration (GSA) appeal. The protest concerns FTS2000, the Federal Government's comprehensive telecommunications contract. GSA and AT & T agreed to modify the FTS2000 contract to add services. Wiltel (and later MCI) protested the modification for exceeding the scope of the FTS2000 contract. Because the Competition in Contracting Act (CICA) does not require a separate competitive procurement for this modification to the FTS2000 contract, this court reverses.
 
 BACKGROUND
 
 2
 In 1986, GSA solicited bids for FTS2000, a Government-wide telecommunications system. Under the heading Description/Specifications/Work Statement, the FTS2000's request for proposals describes the scope of the contract:
 
 C.1.3 Objectives
 
 3
 The FTS2000 procurement is designed to meet the following government objectives:
 
 
 4
 a. To obtain a comprehensive set of telecommunications services
 
 
 5
 b. To obtain telecommunications services through two prime service contractors responsible for providing all services and network management
 
 
 6
 c. To accurately forecast telecommunications costs over a 10-year contract period
 
 
 7
 ....
 
 
 8
 e. To adopt an architecture that will provide a smooth transition to an Integrated Services Digital Network (ISDN) environment when it becomes economically attractive
 
 
 9
 f. To encourage competition between the two FTS2000 services contractors as a means of ensuring continued improvements in FTS2000 services and prices
 
 
 10
 Some specific requirements to meet these objectives are described below.
 
 
 11
 C.1.3.1 Telecommunications Services. The government intends to procure the following six telecommunications services: switched voice service, switched data service, switched digital integrated service, packet switched service, video transmission service, and dedicated transmission service. This solicitation describes these services, as well as specific features of these services that the government is likely to procure. It is the government's intent that these services conform as closely as possible with those offered commercially.
 
 
 12
 GSA Request for Proposals number KET-JW-87-02 p C.1.3-C.1.3.1 (RFP); see also Wiltel, 1992 BPD p 201 at 3. This case features one of the six services mentioned above, namely dedicated transmission services.
 
 
 13
 The RFP's next paragraph defines "dedicated transmission service":
 
 
 14
 C.2.1.1 Services. the contractor shall provide the following services:
 
 
 15
 ....
 
 
 16
 f. Dedicated transmission service for point-to-point private line transmission of voice and data.
 
 
 17
 RFP at p C.2.1.1.
 
 
 18
 Dedicated transmission service receives detailed treatment later in the FTS2000 RFP: "Dedicated transmission service includes analog, digital, and T1 transmission service." RFP at p C.2.7. "Analog" includes "(i) voice and analog data at rates up to 4.8 kbps, and (ii) voice and analog data at 9.6 kbps between two FTS2000 service delivery points." RFP at p C.2.7.1. "Digital" includes digital data transmission at 9.6 kbps and at 56 kbps/64 kbps. RFP at p C.2.7.2. T1 is digital data transmission at a rate of 1.544 Mbps. Wiltel at 3, n. 1.; see RFP at p C.2.7.3. The three separate types of dedicated transmission service in the RFP differ primarily in their transmission rates.
 
 
 19
 The RFP encourages offerors to propose additional features:
 
 
 20
 L.37.4.4 Additional Features/Items. The offeror is encouraged to offer additional features and items not identified in the price schedules provided in the RFP, but which the offeror normally supplies to its other customers....
 
 
 21
 Certain general rules apply to what features/items may be offered, as listed below:
 
 
 22
 ....d. They shall be items that can be included under the general scope of this solicitation.
 
 
 23
 RFP p L.37.4.4.
 
 
 24
 The RFP also incorporates by reference a standard changes clause and a "Service Improvements" clause:
 
 H.16 Service Improvements
 
 25
 a. After contract award, the Government may solicit, and the Contractor is encouraged to propose independently, improvements to the services, features, or other requirements of the contract. These improvements may be proposed to save money, to improve performance, or for any other purpose which presents a service advantage to the Government.... Those proposed service improvements that are acceptable to the government will be processed as modifications to the contract.
 
 
 26
 ....
 
 
 27
 e. If a proposal submitted pursuant to this clause is accepted and applied to this contract, the equitable adjustment increasing or decreasing the contract price shall be in accordance with the procedures of the "Changes" clause. The resulting contract modification will state that it is made pursuant to this clause.
 
 
 28
 RFP p H.16.
 
 
 29
 The RFP requires the contractor to present "an annual service plan for approval by the service oversight center." RFP at p C.3.2.10. The plan must assess "areas of growth requiring new access arrangements, the opening of new locations ... forecasting of new telecommunications applications and services, and the like." Id.
 
 
 30
 Congress required GSA to award the FTS2000 contract to two providers in a 60%-40% division. Wiltel, 1992 BPD p 201 at 2. After four and seven years of contract performance, the FTS2000 contract permits the two providers to compete for a larger share of the services. See RFP p H.14. Three companies submitted bids on the FTS2000 RFP--AT & T, Sprint, and Martin Marietta (with whom MCI participated as a subcontractor). In late 1988, GSA awarded the contracts to AT & T and Sprint, with the 60% share to AT & T. Id. at 4-5.
 
 
 31
 The contract awarded to AT & T had a guaranteed value of 270 million dollars over the first four years. Id. at 5. The contract price depends principally on the volume of use by the government. The stated maximum value of the AT & T contract is 15 billion dollars. The current estimated total value of the AT & T contract is 5 to 8 billion dollars. Id. at 10.
 
 
 32
 On March 4, 1992, AT & T submitted a proposal under the Service Improvements clause of the FTS2000 contract. AT & T proposed to modify the contract by adding "T3" circuits as a fourth type of dedicated transmission service. T3 circuits provide digital data transmission at 44.736 Mbps, a rate 28 times faster than T1, the fastest pre-modification dedicated transmission service circuit. GSA evaluated the proposal and determined that federal agencies needed T3 service. GSA also concluded that the proposal was within the scope of the FTS2000 contract.
 
 
 33
 On March 31, 1992, GSA and AT & T entered into Modification PS95, a "bilateral modification to incorporate an enhancement feature to the Dedicated Transmission Service." See Wiltel, 1992 BPD p 201 at 9-10. The modification provides for procurement of twenty-one T3 circuits joining pairs of locations from among a set of thirty. Id. at 19. The total value of the modification is approximately 100 million dollars. See id. at 10.
 
 DISCUSSION
 Standard of Review
 
 34
 This court upholds the Board's decision on a question of fact "unless the decision is fraudulent, or arbitrary, or capricious, or so grossly erroneous as to necessarily imply bad faith, or if such decision is not supported by substantial evidence." 41 U.S.C. Sec. 609(b) (1988). This court reviews the Board's legal conclusions de novo. Id.
 
 Modification
 
 35
 The Competition in Contracting Act (CICA) requires executive agencies, when procuring property or services, to "obtain full and open competition through the use of competitive procedures." 41 U.S.C. Sec. 253(a)(1)(A) (1988). CICA, however, does not prevent modification of a contract by requiring a new bid procedure for every change.[1] Rather only modifications outside the scope of the original competed contract fall under the statutory competition requirement. CICA sets forth no standard for determining when modification of an existing contract requires a new competition or falls within the scope of the original competitive procurement.
 
 
 36
 This court's predecessor, the Court of Claims, set forth a standard for determining whether a contract modification is within the scope of the underlying contract:
 
 
 37
 Under established case law, a cardinal change is a breach. It occurs when the government effects an alteration in the work so drastic that it effectively requires the contractor to perform duties materially different from those originally bargained for. By definition, then a cardinal change is so profound that it is not redressable under the contract, and thus renders the government in breach.
 
 
 38
 Allied Materials & Equip. Co. v. United States, 569 F.2d 562, 563-64, 215 Ct.Cl. 406 (1978); see also Air-A-Plane Corp. v. United States, 408 F.2d 1030, 1032-33, 187 Ct.Cl. 269 (1969). The question presented in this case is slightly different from the cases which produced this cardinal change doctrine.
 
 
 39
 This case does not ask whether Government modifications breached a contract, but asks instead whether Government modifications changed the contract enough to circumvent the statutory requirement of competition. The cardinal change doctrine asks whether a modification exceeds the scope of the contract's changes clause; this case asks whether the modification is within the scope of the competition conducted to achieve the original contract. In application, these questions overlap. See American Air Filter Co., 57 Comp.Gen. 567, 572-73 (1978) (affirming on reconsideration 57 Comp.Gen. 285 (1978)). A modification generally falls within the scope of the original procurement if potential bidders would have expected it to fall within the contract's changes clause. Id. at 573.
 
 
 40
 In determining whether a modification falls within CICA's competition requirement, this court examines whether the contract as modified materially departs from the scope of the original procurement. See Neil R. Gross & Co., B-237434, 90-1 CPD p 212 at 2-3 (Feb. 23, 1990), aff'd on reconsideration, B-237434.2, 90-1 CPD p 491 (May 22, 1990) ("[W]e look to whether there is a material difference between the modified contract and the prime contract that was originally competed."); American Air Filter, 57 Comp.Gen. at 286 (The test is "whether a changed contract is materially different from the competed contract."). The analysis thus focuses on the scope of the entire original procurement in comparison to the scope of the contract as modified. Thus a broad original competition may validate a broader range of later modifications without further bid procedures.
 
 Scope of the FTS2000 Contract
 
 41
 The FTS2000 contract encompasses "a comprehensive set of telecommunications services" for the entire Federal Government. See RFP p C.1.3. By its terms, FTS2000 covers a broad range of telecommunications services. The contract also has the objective of "accurately forecast[ing] telecommunications costs over a 10-year contract period." Id. With services extending over this lengthy period, potential bidders on the FTS2000 certainly contemplated extensive modifications to meet changing needs of the entire Federal Government.[2] In sum, this contract's breadth suggests that a broad range of modifications would fall within the scope of its changes clause.
 
 
 42
 The FTS2000 contract also explicitly includes a Service Improvements Clause. This clause expressly encourages contractors "to propose independently improvements to the services, features, or other requirements of the contract." RFP p H.16. FTS2000 explains that improvements acceptable to the Government "will be processed as modifications to the contract." Id. Indeed the contract requires contractors to draft an annual service plan. This annual plan provides a mechanism for contractors to suggest new access arrangements, new telecommunications services, and other alterations to meet the Government's needs over this lengthy service contract. RFP p 3.2.10.
 
 
 43
 The FTS2000 contract also expressly mentions transition to more advanced technology as it becomes available commercially. See, e.g., RFP p L.37.4.4. Indeed the contract states that services under the contract should "conform as closely as possible with those offered commercially." RFP p C.1.3.1. Thus, potential bidders had full notice that the FTS2000 contract would require extensive alterations to meet the Government's changing needs and the changing technology of telecommunications.
 
 
 44
 The T3 technology fits within the work obligations undertaken by the FTS2000 contractors. The contractors promised to provide "dedicated transmission service." According to the contract, this service includes analog, digital, and T1 transmission service. These three types of service differ primarily in their transmission rates. T1 is faster than digital which is faster than analog.
 
 
 45
 T3 is the next generation of dedicated transmission service. T3 conveys the same voice or data information as the other forms of dedicated transmission service, but at a higher rate of speed. The higher capacity T3 circuits convey information twenty-eight times faster than the T1 technology. In the interim between the original procurement and the modification, T3 became commercially available on a wide-scale. In light of the contractor's obligations to propose improvements to keep the Government's telecommunications technology in step with technology advances, T3 falls within the scope of the FTS2000 contract.
 
 
 46
 The Board erred in its reading of RFP p H.16, the Service Improvements clause. The Board concluded that this clause did not authorize the addition of T3 to the contract because T3 was not an "improvement to the services, features, or other requirements of the contract." The Board limited the clause to improvements in the existing services, namely the analog, digital and T1 services. This erroneous interpretation overlooks the contractor's obligation to improve Dedicated Transmission Service as a whole.[3] The RFP lists Dedicated Transmission Service as one important service under the contract. The term Dedicated Transmission Service is not merely a heading of the contract. The contract specifically defines the term as "point-to-point private line transmission of voice and data."
 
 
 47
 The Board erred in assuming that the term "service" has one and the same meaning in various contexts. To the contrary, the FTS2000 contract uses "service" in many distinct ways. For instance, a comprehensive "service" can include more than one component "service": "Dedicated transmission service includes analog, digital and T1 transmission service...." RFP p C.2.7 (emphasis added). The FTS2000 contract refers to the entire performance of the contract as well as parts thereof as a "service."
 
 
 48
 Moreover the Service Improvement clause includes sweeping language to ensure the Government obtains any service advantage: "These improvements may be proposed to save money, to improve performance, or for any other purpose which presents a service advantage to the Government." RFP p H.16. The clause expressly notes that acceptable improvements "will be processed as modifications." Id. Because the FTS2000 contract itself defines Dedicated Transmission Service as a "service," this court concludes that improvements in that service fall within the Service Improvements clause.
 
 Bidders' Expectations
 
 49
 An important factor in determining the scope of the original competition is "whether the solicitation for the original contract adequately advised offerors of the potential for the type of changes during the course of the contract that in fact occurred, or whether the modification is of a nature which potential offerors would reasonably have anticipated." Neil R. Gross & Co., 90-1 CPD p 212 at 3 (1990) (citation omitted). The FTS2000 contract highlights the Government's desire to procure state-of-the-art comprehensive telecommunications services from two prime contractors. In particular, the breadth of the stated objectives, the meaning of the Service Improvements clause, the express language about commercially available technology, and the requirement for an annual forecast of new technologies would suggest to potential offerors that the next generation of Dedicated Transmission Service would reasonably fall within the scope of the contract.
 
 
 50
 Other Board cases support the conclusion that potential bidders would have interpreted the scope of the FTS2000 contract to include this modification. In MCI Telecommunications Corp., GSBCA No. 11963-P, 1992 BPD p 287, 1992 WL 292853 (MCI II ), MCI protested a modification to the AT & T FTS2000 contract. The modification added multipoint service to the contract's dedicated transmission service. The contract defined dedicated transmission service as point-to-point transmission of voice and data. Multipoint service connects more than two points at the same time. In finding the modification within the scope of the contract, the Board determined:
 
 
 51
 The record ... establishes beyond doubt that all of the offerors for the FTS2000 contract, and the Government, believed that the successful vendors would provide virtually all commercially available intercity telecommunications services to the user agencies, and that the losing vendor would be essentially shut out of that business for a ten-year period.
 
 
 52
 MCI II, 1992 BPD p 287 at 14. Although the Board noted that it "need not decide ... whether all of those grand expectations were reasonable," id., the Board found that the expectation that multipoint would have been within the scope of the contract was clearly reasonable. Likewise, this court concludes that the offerors at the time of the competition would reasonably have believed T3 to be within the scope of the contract.
 
 
 53
 The Board gave undue emphasis to GSA's purported "rejection" of offers to include T3 in the original procurement. The Board's own findings disclose that "GSA did not accept, or even evaluate, any of [the] additional features or items, like T3, that offerors proposed." Wiltel at 5. GSA's non-acceptance and refusal to consider T3 was not a rejection, nor the type of disapproval which would have led a reasonable bidder at the time to conclude that the non-accepted proposals were outside the scope of the contract and its changes clause.
 
 Conclusion
 
 54
 In sum, the Board erred by focusing on the differences between T1 and T3, rather than on the modification in the context of the contract as a whole. The Board also failed to properly evaluate the reasonable expectations of offerors at the time of the competition. Based on the Board's findings and on its own review of the record, this court concludes as a matter of law that the modification at issue is within the scope of the FTS2000 contract. This court thus reverses and remands with directions to dismiss the protest.
 
 Costs
 
 55
 Each party to bear its own costs.
 
 
 56
 REVERSED.
 
 
 
 [1]
 Congress did not intend to prevent contract modification. Other statutes specifically recognize that federal procurement contracts may be modified. See 41 U.S.C. Sec. 423(e)(1) & (2) (Supp. III 1991) (providing that certain certifications must be made by the contractor and the contracting officer before an agency may award a contract or agree to a modification or extension of a contract)
 
 
 [2]
 Other Board decisions construing the scope of the FTS2000 contract support this reading of the contract. In MCI Telecommunications Corp., GSBCA No. 10450-P, 1990 BPD p 55, 1990 WL 18930 (MCI I ), MCI protested a modification of U.S. Sprint's FTS2000 contract. The modification enhanced the contract's switched voice service. The Board denied the protest, concluding that "the contract as contemplated and awarded was intended to permit the Government to obtain enhanced capabilities such as those provided under the contract modification." The Board characterized the FTS2000 contract as "a contract which ... permit[s] the Government to obtain services under the contract as they become available." MCI I, 1990 BPD p 55 at 14
 
 
 [3]
 Similarly the Board erred by focusing only on the differences between T3 and T1. The "service" at issue is the entire service under the contract. The Board should have compared the service performed by AT & T under the contract before the modification with the service to be performed under the contract after the modification. Before the modification, viewed from the perspective of the contract as a whole, AT & T was providing "comprehensive telecommunications services" to federal agencies. A modification adding a more advanced speed of dedicated transmission service does not substantially affect the type of service AT & T performs under the contract as a whole
 The Board also erred in comparing "only the incremental difference in cost between providing a T1 and a T3 line." Wiltel at 15. Because the proper comparison is between the competed contract and the contract as modified, the pricing of the "service" refers to the pricing of the contract's entire service.