CARDINAL MAINTENANCE SERVICE, INC., Plaintiff,

v.

The UNITED STATES, Defendant,

and

Navales Enterprises, Inc., Defendant–Intervenor.

No. 04–94C.

United States Court of Federal Claims.

Nov. 22, 2004.

Joseph A. Camardo, Jr., Auburn, NY, for plaintiff.

Kenneth D. Woodrow, U.S. Department of Justice, Washington, DC, with whom were Peter D. Keisler, Assistant Attorney General, and Director David M. Cohen, for defendant. Christopher Cole, Department of the Air Force, Arlington, VA, of counsel.

Johnathan M. Bailey, San Antonio, TX, for defendant-intervenor.

### OPINION ON CROSS-MOTIONS FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD

FIRESTONE, Judge.

Pending before the court are the parties' cross-motions for judgment upon the administrative record pursuant to Rule 56.1 of the Rules of the United States Court of Federal Claims ("RCFC").[1] The plaintiff, Cardinal Maintenance Service, Inc. ("Cardinal"), challenges the award of a contract for custodial services at Hickam Air Force Base, Hawaii ("Hickam AFB") to the intervenor, Navales Enterprises, Inc. ("Navales"). Prior to the award of the contract in dispute, Cardinal had been the incumbent custodial service contractor at Hickam AFB. The subject contract was awarded by the defendant, the United States Air Force (the "Air Force" or "government") to Navales on February 20, 2003. Cardinal filed the present action nearly a year later on January 27, 2004. Cardinal challenges both the award of the contract to Navales and the Air Force's post-award administration of the contract. Cardinal charges that the Air Force violated the Competition in Contracting Act, Pub.L. No. 98–369, 98 Stat. 1175 (1984) ("CICA"), by authorizing contract modifications outside the scope of the original contract. For the reasons set forth below, Cardinal's motion for judgment upon the administrative record is **GRANTED**. The government's and Navales' cross-motions for judgment upon the administrative record are therefore **DENIED**.

## I. Statement of the Facts

### A. The Solicitation and Award

The following facts are set forth in the Administrative Record ("AR") and are not in dispute. On June 7, 2002, the Air Force issued Request for Proposal No. F64605–02–R–0026 ("RFP") for custodial services at Hickam AFB. The solicitation combined Contract F64605–97–C–0004 for custodial services in Building 1102 for the Pacific Air Command ("PACAF") and contract F64605–97–C–0017 for custodial services for the 15th Air Base Wind buildings. In all, the RFP called for the performance of custodial services in approximately 92 buildings throughout Hickam AFB. The solicitation stated that the contract would be awarded for a base year with four one-year options, except for the PACAF headquarters building, which would have a six-month base period and four one-year options. Prior to issuing the RFP, the Air Force imposed a fifteen percent reduction in funding FY2003 contracts for custodial services, refuse collection, and grounds maintenance.

The solicitation included descriptions of the types of cleaning services being procured. It identified the following general categories: basic cleaning services; basic restroom/locker rooms cleaning services; periodic cleaning services; and emergency or special event cleaning services. AR at 209–211. The solicitation provided estimated workloads for each category. In addition, the solicitation set forth certain special requirements, including: providing custodial services at Hickam AFB's Child Development Centers; cleaning tile floors in buildings 1725 and 1726; providing special care in cleaning the headquarters building of the PACAF; and cleaning the exterior courtyards and monuments. AR at 211.

The Air Force received twenty-four proposals in response to the RFP. Proposals ranged in price from $3,358,041.90 to $9,586,407.50. The government also pre-

---

1. Also pending before the court are the government's and the intervenor's motions to strike the affidavits submitted by Cardinal in support of its motion. Cardinal has also moved to supplement the Administrative Record by conducting depositions of the Contracting Officer, the Director of Child Development Centers, and two building directors at Hickam Air Force Base. For the reasons noted below, the government's motion to strike and the intervenor's motion to strike, both of which concern these affidavits, are **GRANTED**.

pared an internal independent estimate of the appropriate cost of the contract. The independent government estimate ("IGE"), dated January 23, 2003, was for $6,586,983.00 excluding two contract line items ("CLINs"). These two line items were to be inserted into the contract along with figures which the cost of the CLINs, if inserted, were not to exceed. All of the offerors were determined responsive and all, with the exception of one contractor who withdrew from the competition, were considered for award.

The record reveals that the Air Force's Source Selection Authority performed a best value evaluation. The best value was determined by evaluating two factors: price and past performance. Because past performance was weighted nearly equal to price, the government reserved the right to select an offer other than the lowest price offer when the perceived benefits of the higher priced proposal merited the additional cost. The evaluations were conducted on an anonymous basis.

With respect to price, the Air Force did not consider cost or pricing data in determining the reasonableness and realism of the offered prices because the Air Force had invoked part 15.403–1(b)(1) and (c)(1) of the Federal Acquisition Regulation ("FAR"). Part (b)(1) provides for "Exceptions to cost or pricing data requirements."[2] The Air Force determined that the "Exceptions" provision applied on the grounds that it had received adequate price competition as defined by FAR 15.403–1(c)(1). The Air Force reviewed each proposal to validate the accuracy of the pricing schedule for each contract line item. Proposals were evaluated by comparing the offered prices in accordance with FAR part 15.404–1(b)(2)(i), (ii), (iii), and (v). As provided for in FAR part 15.404–(b)(2), the Air Force contracting officer compared each offer to: (1) other offers; (2) previous government contracts; (3) parametric esti-mates/application of rough yardsticks obtained through field observations, such as the amount of time spent per square foot of building space; and (3) bottom line costs of the IGE. *See* AR at 8; 48 C.F.R. § 15.404(b)(2). Navales' price proposal for the base and option years amounted to $4,066,463.95. Cardinal's price proposal amounted to $5,957,133.60 for the same services.

With respect to past performance, the Air Force assessed each offeror's past performance as a prime contractor on similar service contracts. The assessment was subjective; however, it was based on an evaluation of the scope of the information provided. An Exceptional/High Confidence rating was given to those offerors for whom "essentially no doubt exists that the offeror will successfully perform the required effort." AR at 29. A Very Good/Significant Confidence rating was given to those offerors whose performance record leaves "little doubt ... that the offeror will successfully perform the required effort." *Id.* Ratings below Very Good included Satisfactory, Neutral, Marginal and Unsatisfactory. After the evaluation process Navales was given a Very Good/Significant past performance rating. Cardinal was given an Exceptional/High Confidence past performance rating. *Id.*

The Source Selection Evaluation Report ("SSER") sets forth in detail the basis for the Air Force's selection of Navales for award. After comparing Navales to the other offerors, the SSER concluded: "[Navales'] Very Good/Significant Confidence past performance rating, together with their strengths of providing strong top management, excellent administrative support and experienced project managers in previous contracts, and their lower price outweighs Offerors [Cardinal], X, A and D's Exceptional/High Confidence rating at a higher price.

---

**2.** FAR pt. 15.403–1(c)(1) provides, in relevant part: "*Standards for exceptions from cost or pricing data requirements* (1) *Adequate price competition.* A price is based on adequate price competition if(i) Two or more responsible offerors, competing independently, submit priced offers that satisfy the Government's expressed requirement and if(A) Award will be made to the offeror whose proposal represents the best value (see 2.101) where price is a substantial factor in source selection; and (B) There is no finding that the price of otherwise successful offeror is unreasonable. Any finding that the price is unreasonable must be supported by a statement of the facts and approved at a level above the contracting officer." 48 C.F.R. § 15.403–1(c)(1) (2004) (emphasis in original).

Therefore, I consider [Navales] to be the best value to the Government." AR at 34.

On February 27, 2003, the Air Force sent a letter to each unsuccessful bidder, including Cardinal, explaining why the contract was awarded to Navales. Cardinal filed a bid protest regarding the award with the General Accounting Office ("GAO") on March 14, 2003. Cardinal withdrew its protest before the GAO issued a decision. On July 1, 2003, Navales commenced performance.

### B. Post–Award Modifications to the Navales Contract

The solicitation provided that the Air Force would have the right to expand or contract the quantity and type of custodial services to be provided by the winning bidder following the award. The proposal required offerors to complete and submit an "Add/Delete of Service Cost Sheet" immediately following award. Section 1.6 of the Solicitation stated:

> 1.6 *Additions/Deletions*: The contractor shall provide costs for adding or deleting services on Appendix D. Negotiations and final acceptance of the prices proposed in appendix D may be held prior to or immediately after award with the intent to incorporate the prices as part of the contract. Appendix D will then be utilized during the contract performance period to facilitate the incorporation of additions and deletions of services.

AR at 435.

The Navales contract has been modified eight times following its initial award. The first modification, Modification P00001, dated July 1, 2003, delayed performance due to Cardinal's bid protest. As a result, the total price for the base year, which had been $813,292.79 was decreased by $203,298. Thereafter, Modification P00002, dated July 8, 2003, increased the contract by $72,000.99 to add additional restroom cleaning and trash removal services at the PACAF headquarters building. The PACAF required a higher level of cleaning services than it was receiving under the contract. Thereafter, Modification P00003, dated August 1, 2003 was issued. Modification P00003 amended the contract to allow Navales to be paid twice per month instead of the contract's original schedule, which called for monthly payments. Modification P00003 also memorialized the parties' agreement to eliminate the "Add or Delete Services Cost Sheet" [sic] from the contract and to instead negotiate a price for future modifications. AR at 4858. The modification allowed the Air Force to add and delete work from the Navales contract without regard to Section 1.6, noted above. The reasons for Modification P00003 are included in the Price Negotiation Memorandum for Modification P00004.

Modification P00004, dated August 15, 2003, increased the quantity of service required for the men's and women's locker rooms. It also added cleaning of the spinning room and lobby and weekend service at the base Gymnasium/Fitness Center, including the Health and Wellness Center. This modification increased the total annual cost of the contract by $183,689.98. The Price Negotiation Memorandum for the Modification states, in relevant part, as follows:

> Contract No. F64605–03–C–0003 was awarded on 27 February 2003 and was protested to the U.S. General Accounting Office on 14 March 2003. . . . a. Due to the short lead-time prior to contract performance, it is paramount that *the government immediately begins requesting proposals from the contractor for incorporating services that were initially omitted from the contract.* It was decided that a request would be issued for all areas that needed to be addressed and modifications would be executed in order of priority and impact.

AR at 4871 (emphasis added). With respect to Modification P00003, the Price Negotiation Memorandum goes on to state:

> b. [Modification P00003] had been previously executed changing the base period of performance and eliminating a price sheet that was to be used for minimal additions and deletions of service. It was determined in the best interest of parties, the government and the contractor, for this pricing structure to be deleted by modification and all future modifications to be accomplished through negotiation. This

was found necessary due to the volume of square footage omitted from the contract statement of need. *Had the price sheet been used it would have resulted in extremely excessive costs bordering changes outside the scope of the contract.* AR at 4871(emphasis added). Finally, the Price Negotiation Memorandum explains the rationale for eliminating a portion of the Navales contract dealing with the Child Development Centers. This portion of the contract was later awarded to Choe Enterprises, Inc. ("Choe"), another government contractor. The Price Negotiation Memorandum stated:

> c. *Because the value of the proposed modifications was considerable in comparison to the awarded contract amount each individual requirement was reviewed to determine if it was possible to remove them from the [Navales contract] and award them separately.* For instance, in the case of the Child Development Center (CDC), it was mutually agreed between the government and the contractor, that this was possible due to the minimal amount of work the contractor was currently performing within the CDC. Therefore, the CDC requirement will be removed and negotiated as a sole source 8a contract, in accordance with FAR part 19. In the case of the gymnasium requirement, the contractor was currently performing work to the extent that did not make it a severable requirement, nor was it reasonable for the government to split the requirement and have two separate contractors performing custodial services within the same building.

AR 4871–72 (emphasis added).

All told, the modifications for the first year included a decrease of $203,298 due to a start date delay and an increase of $255,689.98 for modifications P00002 and P00004. This resulted in a net increase of approximately $52,000 over the original contract price for the base year.

The next modification was Modification P00007.[3] Modification P00007, dated September 1, 2003, was the exercise of option year one for the period of October 1, 2003 through September 30, 2004. AR at 4890. Modification P00008, dated October 1, 2003, modified the cleaning requirements for buildings 1102 and 1106 for the follow-on year by adding additional services. In particular, the Price Negotiation Memorandum for Modification P00008 provided a $199,692.48 increase to the base contract amount. AR at 4904. Modification P00009 funded the first option year. The total funded amount remained the same.

Modification P00010, issued on October 10, 2003, eliminated the requirements for custodial services at the four Child Development Centers, so that the services could be reprocured as an 8(a) contract. This was the modification referenced above in the Price Negotiation Memorandum for Modification P00004. Modification P00010 resulted in a decrease of $31,158.48 to the funded amount of the contract. AR at 4927. The Air Force stated that the modification was issued after it determined that services for the Child Development Centers would be appropriate for a small business and that a contract could be awarded without full and open competition. The Air Force issued solicitation no. F64605–03–R–0071 on September 23, 2003; on October 1, 2003, the Air Force awarded the contract for custodial services at the Child Development Centers to Choe. It is not disputed that the contract for the Childhood Centers is for $261,885.60.

It is also undisputed that on September 1, 2003, Cardinal was awarded Order No. SPN–B–SOX–400 for cleaning the GSA store on the Hickam AFB. The contract was for $24,804.00. Cardinal contends that if all modifications to the Navales contract and additional contracts are considered, then the total cost to the government for custodial services at Hickam AFB increased by nearly eighty percent from the original contract price.

**C. Cardinal's Affidavits**

Cardinal alleges the following facts as found in affidavits submitted with its motion. The affidavit of Donald Harmon, President of Cardinal, states that Cardinal received the

---

3. There were no Modifications P00005 or P00006.

GSA store contract because of Navales' "unacceptable performance." Harmon Affidavit of 4/21/2004. Cardinal further claims that it was asked to provide the U.S. Army with a quote for certain custodial services at other buildings on Hickam AFB because of Navales' "unacceptable performance." *Id.*

Arnold Gomes, Operations Manager for Cardinal, states in his affidavit that he has learned from former Cardinal employees who now work for Navales that employees were not being paid, were not given sufficient time to work, and did not have adequate cleaning supplies. He also states that a Navales employee was allowed to stay on base housing. Gomes Affidavit of 4/22/2004.

Finally, both Arnold Gomes and Winston Howard, a Cardinal contract manager, state in their affidavits that, prior to submitting Cardinal's bid, they were assured that there would be no service cuts under the subject contract. Gomes Affidavit of 4/22/2004; Howard Affidavit of 4/22/2004. Arnold Gomes states that he talked with Mr. Gianetti, director of the base gymnasium. He also claims to have spoken with the director of the Child Development Centers. Mr. Gomes claims that he was assured that service to these facilities would not be reduced under the upcoming contract. Gomes Affidavit of 4/22/2004. Mr. Howard states that he had discussions with Willie Newhouse, the Facilities Director of Building 1102, "regarding the cuts in services that were included in the RFP." Howard Affidavit of 4/22/2004. He contends that he was told that "there would be no service cuts under the new contract." *Id.* They claim, however, that the contract eventually awarded to Navales under the RFP "did reduce the services given to various facilities." Gomes Affidavit of 4/22/2004. Cardinal argues that these statements prove that the Air Force knew prior to awarding the Navales contract that it would have to modify the contract in order to restore the level of custodial service required to meet the needs of the base.

## II. Statement of the Case

In its January 27, 2004 complaint, Cardinal challenges the award of Contract No. F64605–03–C–001 to Navales. Cardinal also challenges the Air Force's award, to Choe, of Contract No. FA5215–04–C–0004 for custodial services at the Child Development Centers at Hickam AFB. Navales was granted leave to intervene on February 26, 2004. Choe failed to file a timely request for intervention.

Cardinal challenges the Air Force's contract award to Navales on the ground that the Air Force failed to conduct a proper price reasonableness determination. Cardinal also challenges the Air Force's modifications to the Navales contract. Cardinal argues that the contract modifications that have taken place, along with any possible additional future modifications, are tantamount to a "cardinal" change to the original contract and therefore a new solicitation was required under CICA. Cardinal charges that the Air Force violated CICA by failing to obtain full and open competition through the use of competitive procedures. Finally, Cardinal argues that had the Air Force issued a proper RFP for the level of custodial services it is presently receiving at Hickam AFB, taking into account all of the modifications, then Cardinal originally presented a competitive price.

Cardinal requests that the court direct the government either to terminate the contracts being performed by Navales and Choe or, alternatively, order the government to refrain from exercising any further contract options. In addition, Cardinal asks the court to order the government to resolicit the procurement for custodial services at Hickam AFB "utilizing a[sic] RFP which adequately reflects the actual needs of the Government." Pl.'s Cross–Mot. J. Admin. Record ("Pl. Cross–Motion") at 20.

The government and Navales have opposed Cardinal's motion for judgment upon the administrative record and have cross-moved for judgment upon the administrative record. Oral argument was held on October 20, 2004.

## III. Discussion

### A. Standard of Review

This court has jurisdiction over the plaintiff's claim pursuant to the Tucker Act, 28

U.S.C. § 1491(b)(1) (2004). Under the Tucker Act, this court has jurisdiction, *inter alia*, over objections to "the award of a contract" and over any "alleged violation of statute or regulation in connection with a procurement." 28 U.S.C. § 1491(b)(1). This court reviews challenges to agency actions described in § 1491(b)(1) according to the standards set forth in the Administrative Procedure Act, 5 U.S.C. §§ 701–706 ("APA"). 28 U.S.C. § 1491(b)(4). Under the APA, the reviewing court may only overturn an agency action if the court finds that it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (2004).

**B. Cardinal's Request to Supplement the Record**

■ Because actions under § 1491(b)(1) are subject to the APA standard of review, review is generally limited to the administrative record. Supplementation of the record is, however, allowed in limited circumstances where the record is insufficient for the court to render a decision. *See Impresa Construzioni v. United States*, 238 F.3d 1324, 1338–39 (Fed.Cir.2001). In this case, Cardinal seeks to supplement the administrative record with affidavits from Messrs. Harmon, Gomes, and Howard. In addition, it seeks to depose: James Watanabe, the contracting officer: Willie Newhouse, Facilities Director, Building 1102; Douglas Gianetti, the director of the base gymnasium; and the Director of the Child Development Centers.

■ The government has objected to the introduction of the affidavits on the grounds that the affidavits are both outside the administrative record and otherwise inadmissible. In particular, the government contends that supplementation of the administrative record is authorized only when the record fails to provide an adequate explanation of the contracting officer's decision. Here, the government argues that the contracting officer's decision is adequately explained. The government further argues that even if the record did not provide an adequate explanation, the affidavits from Cardinal's employees contain inadmissible hearsay and as such must be excluded.

Cardinal argues in response that the affidavits should be considered. Cardinal contends that the affidavits contain admissible evidence and "clearly establish evidence of the Government's pre-award intent to reinsert the deleted services into Navales' and Choe's contracts." Pl.'s Cross–Mot. Suppl. Adm. Record at 14. Cardinal also argues that the depositions should be allowed for the purpose of establishing the contracting officer's intent. Cardinal asserts that these individuals have "relevant and material" evidence regarding the government's intent to make cardinal changes to the contract after the contract award. Cardinal argues that the administrative record does not provide a sufficient explanation of the government's actions.

The court agrees with the government that supplementation of the record is not proper in this case. First, the court agrees, for the reasons identified by the government, that the statements in the plaintiff's affidavits are irrelevant in that they do not purport to contain statements by the contracting officer or his authorized representative. *See* 48 C.F.R. § 2.101 (2004). Second, the purported statements by government employees are hearsay and are inadmissible on that basis. *See* Fed.R.Evid. 801. The court agrees with the government that none of the hearsay exceptions apply. Thus, the affidavits may not be used to supplement the administrative record and will not be considered.

■ Finally, the court agrees with the government that Cardinal has not made a case for conducting additional depositions. While Cardinal asserts that the contracting officer knew sometime prior to the time of the contract award that the contract did not provide for a level of custodial services adequate to meet the needs of the Air Force at Hickam AFB, the administrative record expressly states otherwise. As noted above, the contracting officer expressly states in the Price Negotiation Memorandum for Modification P00004 that

> [d]uring the period of the protest it was recognized that the government had awarded the contract with a significant reduction in services that would result in

the services to be provided being insufficient to most agencies. Upon award the government began immediately compiling requirements for the projected areas of the contract to be modififfied [sic] once the protest was resolved.

AR at 4871. The memorandum then goes on to explain how the contracting officer responded to the problem. This same explanation is provided in the Price Negotiation Memorandum for Modification P00008. Thus, the court has been provided with an explanation of the contracting officer's decision. The explanation makes plain that the contracting officer knew immediately upon award that the contract would need to be modified. Cardinal has not presented any admissible evidence to show that the contracting officer knew before the award that changes to the contract would be required. The court finds the contracting officer's explanation complete. There is no need for depositions on this issue. Cardinal's request for permission to conduct depositions of the contracting officer and other government officials connected to Hickam AFB is therefore **DENIED.**

The court now turns to the merits of the cross-motions for judgment upon the administrative record.

### C. The Modifications to Navales' Contract and the Award to Choe were made in Violation of CICA

At the heart of Cardinal's case is its contention that the Air Force materially changed the Navales contract in violation of the requirements for competition set forth in CICA. CICA requires executive agencies procuring property or services to "obtain full and open competition through the use of competitive procedures." 41 U.S.C. § 253(a)(1)(A) (2004). Here, Cardinal contends that the government modified the Navales contract in contravention of CICA's competitive procedures. Cardinal asks that the Air Force be required to re-compete a contract for all of the custodial services required by the Air Force.

Whether the Air Force violated CICA's competitive procedures when it modified the Navales contract turns on whether the modifications materially changed the scope of the original contract. As the Federal Circuit explained in *AT & T Communications Inc., v. Wiltel, Inc.,* 1 F.3d 1201 (Fed.Cir.1993), "CICA ... does not prevent modification of a contract by requiring a new bid procedure for every change. Rather, only modifications outside the scope of the original competed contract fall under the statutory competition requirement." *Id.* at 1205.

■ Significantly, CICA does not contain a standard for determining whether a modification falls within the scope of the original competed contract. To address this problem, the Federal Circuit looked to the "cardinal change" doctrine by analogy. The cardinal change doctrine prohibits the government from forcing contractors to undertake tasks that were not within the scope of their original contract. In applying this concept to CICA, the Federal Circuit has held that the government cannot modify a contract to such an extent that the contract, as modified, is materially different from the contract that was originally competed. *Executive Bus. Media, Inc. v. United States Dep't. of Defense,* 3 F.3d 759, 764 (4th Cir.1993). According to the Federal Circuit, the question turns on whether the original contract, as modified, calls for "essentially the same performance." *Id.* at 763 n. 3.

■ Both this court and the GAO, in the exercise of its bid protest jurisdiction, have looked to a variety of factors to determine whether a contract, as modified, calls for "essentially the same performance." *Id.* Several cases have endorsed the factors identified by the Comptroller General in *Matter of: Neil R. Gross & Co., Inc.,* Comp. Gen. B–237,434, 1990 WL 269546 at *2: "In determining the materiality of a modification, we consider factors such as the extent of any changes in the type of work, performance period and costs between the contract as awarded and modified." (citing *Matter of the American Air Filter Co., Inc.,* Comp. Gen. B–188,408, 1978 WL 13375); *see also AT & T Communications,* 1 F.3d at 1205; *CESC Plaza Ltd. Partnership v. United States,* 52 Fed.Cl. 91, 93 (2002); *Northrop Grumman*

*Corp. v. United States,* 50 Fed.Cl. 443, 466 (2001).

Most recently, in *CW Government Travel, Inc. v. United States,* 61 Fed.Cl. 559 (2004), the court found that the addition, by contract modification, of traditional travel services to a contract to provide military travel services using a paperless automated travel management system was a material change; thus the contracting agency's failure to issue a competitive solicitation for traditional travel services violated CICA. As the *CW Government Travel* court explained, a "modification generally falls within the scope of the original procurement if potential bidders would have expected it to fall within the contract's changes clause." *Id.* at 574 (citing *AT & T Communications,* 1 F.3d at 1205).

Tested by the standards set forth in the above-cited cases, the court finds that the addition to, and deletion of work from, the Navales contract materially changed the original competed contract. The changes to the Navales contract were not changes of the type that were specifically authorized or even foreseen in the original contract. Rather, the modifications authorized substantial changes, which the contracting officer identified as "considerable" with costs that were potentially "extremely excessive." AR at 4871. The Navales contract contemplated "minimal additions and deletions of service" which would be accomplished through application of the Add/Delete of Service Cost Sheet, set forth in Section 1.6 of the solicitation. The modifications to the Navales contract were not, however, made through this provision. Instead, the contracting officer concluded that the Air Force needed to remove the Add/Delete of Service Cost Sheet from the Navales contract to make the changes the Air Force wanted. Specifically, the contracting officer explained:

It was determined in the best interest of parties, the government and contractor, for this pricing structure [the Add/Delete of Service Cost Sheet] to be deleted by modification and all future modifications to be accomplished through negotiation.... *Had the price sheet been used it would have resulted in extremely excessive costs bordering changes outside the scope of the contract.*

AR at 4871 (emphasis added). In other words, the Air Force deleted the Add/Delete of Service Cost Sheet clause in the Navales contract, which authorized only minor changes, in order to make future major modifications. The Air Force feared that if it did not do this, then the excessive costs would *"border[ on] changes outside the scope of the contract."* AR at 4871 (emphasis added).[4]

In its briefs and at oral argument, the government relied on several cases for the conclusion that changes such as those made to Navales' contract were not cardinal changes. In *Northrop Grumman,* this court concluded that modifications made to a contract were not outside the scope of the contract, and as such, did not constitute a cardinal change. *Northrop Grumman,* 50 Fed.Cl. at 468. *Northrop Grumman* is not relevantly similar to the present case, however. In that case, following the award the contractor was not fulfilling the contract as it had promised in its original bid. As a consequence, modifications were made in order bring the contractor "up to the specifications of the solicitation and contract. ... The reasonable bidder expects to be held to its promise to provide the government with the benefit of its bargain and to work with the government until that promise is fulfilled." *Id.* at 468. Because the post-award modifications were made to bring performance into line with what the contractor promised, the modifications were, almost by definition, within the scope of the original solicitation. *See id.*

In the present case, the modifications to Navales' contract were not made in order

---

4. At oral argument, the government introduced for the first time an alternate explanation of this language. The government alleged that this language referred to the fact that the original Navales bid suffered from a calculation defect which made the price unreasonably high, and that the final bid as accepted did not suffer from such a defect. As such, the government argues that this language is irrelevant to the cardinal change determination. However, the language of the administrative record does not support the government's explanation. Furthermore, the government could point to no document supporting its allegation. Therefore, the court finds the government's alternative argument unavailing.

ensure that Navales performed in accordance with the original solicitation and contract. Rather, the modifications expressly changed performance from the solicitation and contract on which Navales and the other contractors had bid. Therefore, modification of the Navales contract is distinguishable from the modifications in *Northrop Grumman. See id.*

In *PCL Constr. Serv., Inc. v. United States,* 47 Fed.Cl. 745, 806 (2000), this court considered whether a series of changes amounted to a cardinal change within the meaning of CICA. The court found that there was no cardinal change. However, contrary to the government's suggestion, *PCL* is not like the present case. In *PCL,* the plaintiff's construction manager admitted that "there was not a dramatic change" between the contract as promised to the plaintiff and the contract as modified. *PCL,* 47 Fed.Cl. at 805. Furthermore, the plaintiff's expert conceded that the "nature of the project was not cardinally changed." *Id.* In the present case, by contrast, quite the opposite situation has occurred. Rather than the plaintiff admitting that the changes were *not dramatic,* in the present case the government has admitted that the changes *were dramatic.* As noted, the contracting officer has admitted that "[h]ad the price sheet been used it would have resulted in extremely excessive costs bordering changes outside the scope of the contract." AR at 4871. As a consequence, the circumstances surrounding the court's decision in *PCL* do not lead the court to conclude that the changes in the Navales contract were within the contemplation of the parties; rather, *PCL* is readily distinguishable from the present case and provides the court with support for the opposite conclusion: that the modifications to the Navales contract did in fact amount to a cardinal change.

In addition, the court in *PCL* held that a series of modifications is a cardinal change when they "exceed[ ] the scope of the contract's changes clause." *PCL,* 47 Fed.Cl. at 804. Implicit in this rule is the understanding that the government does not have an unlimited right to modify the contract to eliminate the changes clause itself for the purpose of contravening the competitive nature of the contract. If, as the government maintains, the government can make changes outside the scope of the contract simply by changing the scope of the contract after award, then there would be no force to the cardinal change doctrine, and thus the purposes of CICA would be largely defeated. *See Krygoski Constr. Co., Inc. v. United States,* 94 F.3d 1537, 1543 (Fed.Cir.1996) (holding that the purpose underlying the contracting officer's discretion as to whether to terminate or recompete a contract is to "further full and open competition"). As noted, the contracting officer's decision to modify the Navales contract to eliminate the contract's Add/Delete of Service Cost Sheet had the result of defeating the full and open competition attempted during the original bidding process. For these reasons *PCL,* rather than supporting the government's proposition, belies it by highlighting this essential flaw in the government's elimination of the Add/Delete of Service Cost Sheet.

Lastly, the government points to *Matter of Master Security, Inc.,* Comp. Gen. B–274,-990, 1997 WL 11254, to support its position. In that case, the plaintiff was a provider of security guards for federal buildings. Subsequent to the bombing of the Alfred P. Murrah Federal Building in Oklahoma City, the demand for the plaintiff's guard services increased. As a consequence, the number of hours which the plaintiff's guards were required to work was approximately double of that which was specified in the contract. The GAO found that the change did not amount to a cardinal change which required resolicitation. *Master Security,* Comp. Gen. B–274,990, 1997 WL 11254 at *4. *Master Security* is inapposite to the present case. The contract at issue in *Master Security* specifically contained a disclaimer warning potential bidders that the number of hours required of the contractor was merely an estimate. The contract contained the following language: The quantity of work required "is the government's best estimate at this time of the total quantity of service required. This estimate is not a representation that the estimated quantity will be required or ordered, or that conditions affecting requirements will be stable or normal." *Master*

*Security,* Comp. Gen. B–274,990, 1997 WL 11254 at *3. This provision put the potential bidders on notice that the quantity ordered in the contract was not an essential element of the contract. Upon answering the solicitation, the bidders bore the risk that "conditions affecting requirements [would not] be stable or normal" as in fact they turned out not to be. *Master Security,* Comp. Gen. B–274,990, 1997 WL 11254 at *3. The contract clearly contemplated the possibility that an emergency could occur which would change the government's requirements. As the GAO noted in *Master Security,* the occurrence of an event specifically identified in the contract is not outside the contemplation of the parties. *See Master Security,* Comp. Gen. B–274,990, 1997 WL 11254 at *4.

By contrast, in the present case the government does not point to any provision in the contract that shows that the bidders were on notice that the types of changes which were made were within the scope of the contract. In fact, the government does not allege that any ensuing event, emergency or otherwise, changed the nature of the Air Force's requirements on Hickam AFB. For these reasons, the government's comparison of the provision of sanitation and maintenance services in the present case to the provision of security after the Oklahoma City bombing is unpersuasive.

In view of the foregoing, the government's reliance on the Add/Delete of Service Cost Sheet provision in the solicitation to suggest that the modifications to the Navales contract were within the scope of the original contract is wholly misplaced. Def.'s Cross–Mot. for J. Admin. Record at 15. As explained above, the Air Force specifically modified Section 1.6 of the contract to avoid the limitations provided for in that section. As the contracting officer went on to explain, the proposed modifications to the Navales contract were "*considerable* in comparison to

the awarded contract amount." AR at 4871 (emphasis added). It was for this reason that, "each additional requirement was reviewed to determine if it was possible to remove them from the [contract] and award them separately. For instance, in the case of the Child Development Center (CDC), it was mutually agreed ... that this was possible. ... Therefore, the CDC requirement will be removed and negotiated as a sole source 8a contract." AR at 4871–72. It is not disputed that the Air Force reduced Navales' contract by $31,000 to remove the CDC requirement and then provided Choe with a sole source 8a contract for over $250,000. Indeed, the government has increased the cost of the original contract by nearly eighty percent.[5] Where, as here, the amount of additional work nearly doubles the price of the contract that was awarded, and the nature of the work was so substantially increased that the change provision of the contract had to be deleted to accomplish the modifications, the originally awarded contract has been materially changed. *See Neil R. Gross,* Comp. Gen. B–237,434, 1990 WL 269546.

The Air Force's decision to modify the Add/Delete of Service Cost Sheet of the original contract, in order to avoid changing the "scope of the contract" was not sufficient to overcome CICA's mandates. The government cannot circumvent CICA by modifying a contract to allow for modifications that were not originally within the scope of the contract. *Northrop Grumman,* 50 Fed.Cl. at 464. This would defeat the language and purpose of CICA. Accordingly, where, as here, the government modified the contract to allow for changes not contemplated in the original contract, the government cardinally changed the contract; by doing so without resoliciting the contract, and by instead eliminating the limitations on changes specifically

---

5. The government contends that the correct measure of the increase of the cost of the contract is only forty percent rather than eighty percent. The government reaches this number by arguing that the $250,000 sole source contract to Choe should not be included in the calculation of the change in cost. The government bases this argument on the allegation that the Choe contract included such an increase in services from the original Navales contract as to warrant an increase in price of approximately $220,000 from the original contract. The record does not support such an allegation. However, the court finds that even if the change in contract price was only 40% rather than 80%, in light of all the circumstances in this case, a 40% change in price constitutes a cardinal change.

set forth in the original contract, the government violated CICA. Because the government's procurement was not in accordance with law, the court is authorized to overturn this illegal action. *See* 5 U.S.C. § 706(2)(A); 28 U.S.C. § 1491(b)(4).

### D. Cardinal is Entitled to Injunctive Relief

Having concluded that the Air Force's failure to re-compete the Navales contract violated CICA, the court must now determine whether Cardinal is entitled to the injunctive relief it seeks. Cardinal requests that the court direct the government to terminate the contracts awarded to Navales and Choe or, alternatively, order the government to refrain from exercising any further contract options. In addition, Cardinal asks the court to order the government to resolicit the procurement for custodial services at Hickam AFB "utilizing a[sic] RFP which adequately reflects the actual needs of the Government." Pl. Cross–Motion at 20.

■ The Court of Federal Claims has jurisdiction to award injunctive relief pursuant to 28 U.S.C. § 1491(b)(2) (2004). The Federal Circuit has stated, however, that injunctive relief is an extraordinary remedy and, as a consequence, that this court should award this remedy "in a way that best limits judicial interference in contract procurement." *Parcel 49C Ltd. P'ship v. United States*, 31 F.3d 1147, 1153 (Fed.Cir.1994). Against this backdrop, permanent injunctive relief has been granted where the "plaintiff establishes by a preponderance of the evidence that: (1) it has achieved actual success on the merits; (2) it will suffer irreparable injury if injunctive relief is not granted; (3) the harm to plaintiff if an injunction is not granted outweighs the harm to the Government and third parties if an injunction is granted; and (4) granting the injunction serves the public interest." *Hunt Bldg. Co., Ltd. v. United States*, 61 Fed.Cl. 243, 279 (2004). *See Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546 n. 16, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987) (holding that the "standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood

of success on the merits rather than actual success"). Given Cardinal's actual success on the merits of its claim, the court will address each of the remaining factors in turn.

■ It is well-settled that a party suffers irreparable injury when it loses the opportunity to compete on a level playing field with other bidders. *Hunt*, 61 Fed.Cl. at 280. Irreparable injury includes, but is not limited to, lost profits which would flow from the contract. *SAI Indus. v. United States*, 60 Fed.Cl. 731, 747 (2004). Specifically, when a plaintiff shows that it was excluded from the bidding process, perhaps solely because of the government's improper conduct, the plaintiff has satisfied requirement for irreparable injury. *Id.* In this case, Cardinal lost the opportunity to compete on a level playing field for the contracts awarded to Navales and Choe. In addition, it was excluded from this bidding process because of the government's violation of CICA. As a consequence, Cardinal has shown irreparable injury sufficient to satisfy the requirement for a permanent injunction. *SAI*, 60 Fed.Cl. at 747; *Hunt*, 61 Fed.Cl. at 280.

As to the balancing of harms requirement, the court finds that the harm to Cardinal outweighs the harm to the government. Although requiring the government to re-compete a custodial services contract at Hickam AFB will cost the government some money and effort, it will not completely disrupt the procurement process. The court can fashion relief which will be of minimal disruption to the government, Navales, and Choe. The government has presented the court with a declaration of Gregory Frey, the contracting officer at Hickam AFB. Mr. Frey has stated that a resolicitation of the subject contracts will cost approximately $24,000. Frey Declaration of 10/29/2004. The government argues that this proves that the balance of the harms counsels against the granting of an injunction.

To the contrary, in light of the large size of the contract, and the fact that the plaintiff will be prohibited from bidding on the contract in the absence of an injunction, the court finds that the plaintiff will suffer more harm if the court fails to grant an injunction

than the government will suffer if the court does grant an injunction. In addition, it is even possible that the government will recoup much of its cost of resolicitation if the court grants an injunction; when the contracts are competitively bid, the government might receive a better offer than it now has due to full and open competition. *See SAI*, 60 Fed.Cl. at 747. The harm which will allegedly befall Navales due to an injunction is discounted in the calculation of harms. Navales was the beneficiary of a CICA violation and, as such, suffers no harm when the violation is corrected. *See Al Ghanim Combined Group Co. v. United States*, 56 Fed.Cl. 502, 520 (2003) (holding that when an award process is flawed, an awardee is not harmed when an injunction prevents the awardee's performance). Consequently, the court finds that the harm which the plaintiff will suffer in the absence of an injunction outweighs the harm which will accrue to the government if the injunction is awarded.

Finally, the public interest favors an injunction. The public interest "is served by enforcing a procurement process that conforms with ... the solicitation's evaluation criteria." *Al Ghanim*, 56 Fed.Cl. at 521. In addition, requiring the government to seek the lowest price for the services it requires through a proper solicitation preserves the integrity of the federal procurement process and therefore serves the public interest. *See SAI*, 60 Fed.Cl. at 747; *Parcel 49C*, 31 F.3d at 1154. An injunction that requires a resolicitation, thus minimizing the cost to taxpayers, is also in the public interest. *SAI*, 60 Fed.Cl. at 747. In the present case, an injunction will enforce a process whereby bidders can be confident that the contracts on which they bid will be the contracts which are awarded and performed. An injunction in this case will also promote the integrity of the procurement process by holding the government accountable for its actions. Finally, an injunction in this case may result in lowering the cost to the taxpayers of the work. As a result, an injunction would serve the public interest. Consequently, in light of the four elements of a permanent injunction,

Cardinal's motion for a permanent injunction is **GRANTED**.

### E. Conclusion

For the above-stated reasons, and on those bases alone, Cardinal's cross-motion for judgment upon the administrative record is **GRANTED**.[6] The government's cross-motion for judgment upon the administrative record and Navales' cross-motion for judgment upon the administrative record are **DENIED**. In order to ensure that the court does not needlessly disrupt the custodial work at Hickam AFB, the court directs the government to propose a timetable for the completion of a new procurement within the next nine months. The government shall submit its proposed schedule by **December 6, 2004**. Upon receipt of the proposed schedule, the court will schedule a joint status conference to finalize the terms of the injunction.

**IT IS SO ORDERED**

---

6. Because the court has concluded that Cardinal is entitled to the injunctive relief it seeks based on the government's violations of CICA, it is not necessary for the court to examine whether the government committed errors in awarding the contract to Navales in the first instance.